[Crim. No. 20497. Feb. 18, 1982.]

THE PEOPLE, Plaintiff and Appellant, v.
ROBERT JOSEPH TERESINSKI, Defendant and Respondent.

Counsel

George Deukmejian and Evelle J. Younger, Attorneys General, Robert H. Philibosian and Jack R. Winkler, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and William G. Prahl, Deputy Attorneys General, for Plaintiff and Appellant.

D. Lowell Jensen, District Attorney (Alameda), John J. Meehan, Assistant District Attorney, Ralph Countryman, Deputy District Attorney,

David J. Levy, City Attorney (Concord), and Kenneth C. Scheidig, Assistant City Attorney, as Amici Curiae on behalf of Plaintiff and Appellant.

Paul Halvonik and Quin Denvir, State Public Defenders, Gary S. Goodpaster and Ezra Hendon, Chief Assistant Public Defenders, Richard E. Shapiro and Michael S. Zola, Deputy State Public Defenders, and Lewis F. Shearer for Defendant and Respondent.

Marshall W. Krause, Krause, Baskin & Shell, Krause, Timan, Baskin, Shell & Grant, Ephriam Margolin, Steven Stathatos, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**BROUSSARD, J.**—Our prior opinion in this case (*People* v. *Teresinski* (1980) 26 Cal.3d 457 [162 Cal.Rptr. 44, 605 P.2d 874]) upheld a ruling of the Yolo County Superior Court dismissing charges against defendant on the ground that both the physical evidence linking him to the charged robbery and the identification testimony of the victim were the direct product of an illegal detention. The United States Supreme Court granted certiorari and remanded the case to us for further consideration in light of *United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244]. (*California* v. *Teresinski* (1980) 449 U.S. 914 [66 L.Ed.2d 143, 101 S.Ct. 311].)

The *Crews* decision does not affect our prior conclusion that the arresting officer lacked an objectively reasonable basis for detaining defendant; it confirms our prior ruling that the physical evidence seized as a result of that detention and the subsequent photographic identification are inadmissible. *Crews*, however, casts doubt upon our holding that the identification testimony of the robbery victim must also be excluded. Although we reasoned that such testimony should be excluded if derived in direct causative flow, without intervening act, from the initial detention, the Supreme Court in *Crews* stated that admissibility should turn instead on whether the victim's identification testimony was the result of an independent recollection of the crime, untainted by any confrontation or identification arising from the illegal detention.

██ Upon reconsideration of this issue, pursuant to the mandate of the Supreme Court, we note first that *Crews* is virtually indistinguishable from the present case. Although recognizing the authority of this court to construe the California Constitution to provide protection beyond that afforded by parallel provisions of the federal document, we nevertheless find the reasoning of *Crews* persuasive and consistent with past California decisions; we therefore adopt *Crews* as defining the rights of the parties under the California Constitution.

Under the reasoning of *Crews*, a victim's identification testimony is admissible if based upon his independent recollection untainted by illegal police conduct. In the present case the trial court determined that the identification testimony was the independent product of the victim's observation of defendant during the robbery. Since that determination complies with the requirements of *Crews*, we conclude that the trial court erred in suppressing the testimony

1. *Statement of facts.*

We reproduce the factual recital from our former opinion, adding a brief discussion of the views of the trial judge concerning the independent basis of the identification testimony.

About 2 a.m., Officer Rocha of the Dixon police force saw an unfamiliar car with three occupants proceeding through the city business district. Because of windshield glare he could not see defendant, the driver, but he thought both passengers were juveniles and surmised that the driver also was a minor. Although the car was proceeding at a lawful speed without any suspicious behavior, the officer signaled the driver to stop. He subsequently explained that he detained the car because "I believed there were juveniles in the car. We have a 10:00 o'clock curfew in Dixon."[1]

As the car slowed to a stop Officer Rocha observed defendant and the front-seat passenger glance back and reach down. Those gestures led him to believe that the occupants might be hiding alcohol or reaching for a weapon. Defendant alighted from the car, walked toward the

---

[1]Citing testimony from a proceeding involving defendant's juvenile companion, the Attorney General asserts that the record in this case presents an incomplete and inaccurate account of defendant's activities and Officer Rocha's reasons for detaining defendant. We are constrained, however, to decide this case on the record before us. We cannot take judicial notice of the truth of testimony presented in a different action.

police vehicle, and presented his driver's license. The license verified defendant's adult status, and in fact only one occupant of the car was a juvenile.

Rocha told defendant to stay at the rear of the car, walked to the driver's window, and shined his light on the floorboard. He saw a pool of liquid and a beer can under the front seat. Ordering the two passengers out, he then observed a gun holster; and, after questioning, Rocha retrieved a loaded weapon from the floorboard.[2]

A subsequent search of the car produced several beer containers, a baggie of marijuana, and a paper bag filled with bills and change. The money was traced to a Seven-Eleven store that had been robbed earlier that night in nearby Woodland. Defendant and his two passengers were arrested on suspicion of robbery. Mr. Cady, the store clerk who witnessed the robbery, identified photographs of defendant and his companions. Later at the preliminary hearing Cady identified defendant in person.

Defendant moved pursuant to Penal Code section 1538.5 to suppress both the physical evidence seized and the identification testimony of Cady, basing his motion primarily on the testimony of Cady and Officer Rocha at the preliminary hearing. Following argument, the court requested briefing on the question whether "under circumstances where the victim is able to identify but is unable to name the defendant as the perpetrator of the crime, if the defendant's name becomes known to the victim as a result of an illegal arrest and mug pictures are taken and shown to the victim, then must the victim's identification of the defendant . . . be suppressed?" Clarifying its request, the court further stated that "Here the Court is satisfied that Mr. Cady was able to identify the defendants. He knew their physical appearance. But he did not know their name, and their names became known to him through the mugshots which were taken as a result of . . . an illegal stop . . . ."

After receiving briefs, the trial court granted the motion to suppress. It ruled, first, that because defendant and his companions were not loitering, Officer Rocha had no basis for detaining them; the detention was therefore illegal. The illegality of the detention compels suppression

---

[2]The issues in this case concern the legality of the initial detention. The scope of the search has not been questioned. (Cf. *People* v. *Superior Court* (*Kiefer*) (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].)

of the evidence found in the car. The trial court also directed suppression of Cady's testimony, on the ground that "[t]here was a direct, immediate and necessary causal connection between the illegal stop and the identifications." Since there remained no evidence linking defendant with the robbery, the court ordered the charges dismissed.

The People appealed. As we noted earlier, this court granted a hearing and affirmed the trial court's ruling in all respects. (26 Cal.3d 457.) The Supreme Court granted certiorari and remanded the case to us for reconsideration in light of *United States* v. *Crews, supra*, 445 U.S. 463, a decision of the high court filed subsequent to our decision in *Teresinski.*

### 2. *Invalidity of the detention.*

Although the Supreme Court's mandate referred only to *United States* v. *Crews*, a decision which does not relate to our earlier holding that defendant's detention was illegal, we have permitted the parties to present additional authorities and argument bearing on that issue. Upon review of the matter, however, we adhere to our prior holding, and adopt the language of the former opinion as modified to take account of additional contentions advanced and authorities cited.

As we noted in our former opinion, *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957] defined the constitutional standard for measuring the validity of a detention. That decision explained that: "to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation omitted], to suspect the same criminal activity and the same involvement by the person in question."

We need only apply that standard to the facts of the present case. The detention here rested upon Officer Rocha's suspicion that de-

fendant and his comrades were violating a city curfew ordinance.[3] Contrary to Officer Rocha's statement, the ordinance does not declare it a crime for minors to be found in public after 10 p.m. It provides that it is unlawful for a minor "to loiter, idle, wander, stroll, or play in or upon the public streets" and other public places between 10 p.m. and 5 a.m.[4] These terms cannot reasonably be construed to encompass defendant's conduct.

The word "loiter" in particular bears a sinister connotation: it generally connotes lingering for the purpose of committing a crime. (*In re Cregler* (1961) 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305]; but see *In re Nancy C.* (1972) 28 Cal.App.3d 747, 755 [105 Cal.Rptr. 113].) As the court noted in *People* v. *Horton* (1971) 14 Cal.App.3d 930, 933 [92 Cal.Rptr. 666]: "driving along city streets, even at 1:15 in the morning, is not 'loitering.'" (Cf. *City of Seattle* v. *Pullman* (1973) 82 Wn.2d 794 [514 P.2d 1059].) Whether or not the terms "idle, wander, stroll, or play," when used in a curfew ordinance, also carry a sinister connotation, those terms are equally inapplicable to the present case. Conceivably one may "idle, wander," or "play" in an automobile, but merely driving along a street in a lawful manner cannot be so described.

In sum, Officer Rocha lacked any objectively reasonable basis to suspect that defendant or his passengers were violating the prohibi-

---

[3]The ordinance reads:

"Sec. 16.2 *Curfew*—Minors not to be in public after 10:00 P.M.; exceptions.

"It shall be unlawful for any person under the age of eighteen years to loiter, idle, wander, stroll, or play in or upon the public streets, highways, roads, alleys, parks, playgrounds, or other public grounds, public places and public buildings, places of amusement and eating places, vacant lots, or other unsupervised places, between the hours of 10:00 P.M. and 5:00 A.M. of the day immediately following; provided, however, that the provisions of this section do not apply when the person is accompanied by his parent, guardian, or other adult person having the care and custody of the person, or when the person is returning directly home from a meeting, entertainment, recreational activity or dance, or when the person is going directly to or returning directly from work.

"A person under eighteen years may obtain food in a cafe after a meeting, entertainment, recreational activity, dance or work after the hour of 10:00 P.M., but must vacate the premises immediately after consuming the food served and proceed directly home." (Ord. No. 6, 1950, § 1.)

"Sec. 16.4 *Curfew*—Minors under eighteen violating curfew regulations.

"Any person under the age of eighteen years violating the provisions of section 16.2 shall be guilty of a misdemeanor and shall be dealt with in accordance with juvenile court law and procedure. (Ord. No. 6, 1950, § 3.)"

[4]In view of our conclusion that the detention was unlawful, we need not consider defendant's arguments attacking the constitutionality of the ordinance.

tory language of the ordinance.[5] Accordingly, his detention of defendant was unlawful under the standards established in *In re Tony C., supra*, 21 Cal.3d 888, 893.

■ Although it is clear that defendant's conduct did not violate the curfew ordinance, the People nevertheless argue that the detention should be upheld on the ground that the officer's action was based on a "reasonable mistake of law." (Cf. *Hill* v. *California* (1971) 401 U.S. 797 [28 L.Ed.2d 484, 91 S.Ct. 1106] (mistake of fact); *Elder* v. *Bd. of Medical Examiners* (1966) 241 Cal.App.2d 246 [50 Cal.Rptr. 304].) Courts on strong policy grounds have generally refused to excuse a police officer's mistake of law. (See, e.g., *People* v. *McKelvy* (1972) 23 Cal.App.3d 1027, 1036-1037 [100 Cal.Rptr. 661].)[6] We need not decide, however, whether under exceptional circumstances an officer's

---

[5]Curfew ordinances can be classified into two groups: those which prohibit "presence" at the proscribed time and place (see, e.g., the ordinance described in *In re Francis W.* (1974) 42 Cal.App.3d 892 [117 Cal.Rptr. 277]) and those such as the present ordinance which prohibit "loitering" or similar conduct. (See generally *Curfew Ordinances and the Control of Nocturnal Juvenile Crime* (1958) 107 U.Pa.L.Rev. 66, 73; *In re Nancy C., supra*, 28 Cal.App.3d 747, 755.) Apparently Officer Rocha mistakenly thought the Dixon ordinance was of the type which prohibited mere presence upon the city streets after 10 p.m.

Seeking to transform the officer's misconception into reality, the People argue that we should construe the Dixon ordinance to prohibit juveniles from being present on the streets after curfew. Their argument, which is not entirely clear, appears to be that the language of the ordinance, which declares it illegal to "loiter, idle, wander, stroll or play," is so broad as to indicate the city's intention to ban all activity whatsoever, even activity which does not fall within those specific terms. Even if such was the intention of the city council—and the People present no support for that claim—the language of the ordinance cannot reasonably be construed to ban conduct that does not fall within its specific terms.

[6]The Attorney General calls our attention to the en banc decision of the Fifth Circuit in *United States* v. *Williams* (1980) 622 F.2d 830, in which 13 of 24 judges announced in dictum their view that the exclusionary rule should not bar admission of evidence obtained by police officers acting "in good faith" even if its seizure involved a technical violation of the Fourth Amendment. The United States Supreme Court, however, has never endorsed that view, and has frequently required the suppression of evidence in cases in which the police arguably were acting in good faith. (See, e.g., *Robbins* v. *California* (1981) 453 U.S. 420 [69 L.Ed.2d 744, 101 S.Ct. 2841]; *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476].) Adoption by this court of a doctrine limiting the exclusionary rule to searches and seizures conducted "in bad faith," as urged by the Attorney General, would appear barred by *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933] in which the Supreme Court ruled that "all evidence obtained by searches and seizures in violation of the [United States] Constitution is, by that same authority, inadmissible in a state court" (367 U.S. 643, 655 [6 L.Ed.2d 1081, 1090]), and subsequent decisions applying that rule.

reasonable mistake of law might validate police conduct because in this case the officer's mistake cannot be found reasonable.

The curfew ordinance did not present an obscure or unfamiliar enactment to Officer Rocha, but one that he had enforced on numerous occasions. The plain language of the ordinance clearly does not prohibit a minor from simply being present on the streets of Dixon after 10 p.m., but only prohibits such behavior as "loitering" or "idling" on the streets; the officer's belief that Dixon had enacted a blanket curfew ordinance should have been dispelled by a simple reading of the terms of the enactment. Moreover, several years before the detention in the present case, the Court of Appeal in construing a similar ordinance explicitly held that driving a car at a normal rate of speed down a public street did not violate the ordinance. (*People v. Horton, supra,* 14 Cal.App.3d 930.) If we were to find Officer Rocha's mistake of law reasonable under these circumstances, we would provide a strong incentive to police officers to remain ignorant of the language of the laws that they enforce and of the teachings of judicial opinions whose principal function frequently is to construe such laws and to chart the proper limits of police conduct.

### 3. *Suppression of evidence.*

Having found defendant's detention illegal, it necessarily follows that the physical evidence found in the automobile as a result of this detention is inadmissible. (See, e.g., *United States v. Crews, supra,* 445 U.S. 463, 472 [63 L.Ed.2d 537, 546]; *In re Tony C., supra,* 21 Cal.3d 888, 899; *Lockridge v. Superior Court* (1970) 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683].) Since defendant was booked and photographed following that detention as part of the investigation of the Seven-Eleven robbery, the robbery victim's identification of defendant's booking photograph—a photograph taken as a direct and immediate result of that illegality—is also inadmissible. (See *United States v. Crews, supra,* 445 U.S. 463, 473, fn. 18, 477 [63 L.Ed.2d 537, 547, 549]; 3 La Fave, Search and Seizure (1978) § 11.4 and cases there cited; cf. *Davis v. Mississippi* (1969) 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394] (fingerprints); *People v. Sesslin* (1968) 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321] (handwriting exemplar); *People v. McInnis* (1972) 6 Cal.3d 821, 825-826 [100 Cal.Rptr. 618, 494 P.2d 690], which admitted identification evidence based upon a routine booking photograph taken in connection with an unrelated crime, is distinguishable.)

The Attorney General offers no substantial argument to contest the trial court's ruling excluding the physical evidence seized and the photographic identification. He contends, however, that Cady's identification of defendant was admissible, despite the illegal detention, under the reasoning of the United States Supreme Court in *United States* v. *Crews, supra,* 445 U.S. 463.

In *Crews,* three women were robbed in the womens' restroom at the Washington Monument. A few days later a policeman saw defendant loitering near the Monument restrooms, observed that he matched the description given by the women, and attempted to photograph him. When the officer could not get a suitable picture, he took defendant into custody for truancy, photographed defendant at the police station, and released him. After two of the robbery victims identified the photograph, defendant was arrested and charged with robbery.

The trial court ruled that the detention for truancy constituted an illegal arrest, and suppressed both the photographic identification and a subsequent lineup identification. The court permitted the victims to testify at trial, however, and on the basis of that testimony defendant was found guilty of robbery of the first victim.

The Court of Appeals for the District of Columbia overturned the conviction, holding that the in-court identification was the inadmissible product of the illegal detention. (*Crews* v. *United States* (D.C. 1978) 389 A.2d 277.) The United States Supreme Court unanimously reversed. Justice Brennan, joined by all other participating justices, held that the pretrial identifications were inadmissible, but that the robbery victim's identification testimony at trial was admissible. He noted, first, that the victim's identity was known to the police before the illegal detention, and thus her presence at trial was not traceable to any Fourth Amendment violation (445 U.S. p. 472 [63 L.Ed.2d p. 546]). Furthermore, the trial court in *Crews* specifically found that the victim's courtroom identification "rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications." (P. 473 [63 L.Ed.2d p. 547].) Justice Brennan therefore concluded that the in-court identification testimony was not tainted by the prior illegal detention.

The defendant in *Crews,* although acknowledging that an illegal detention in itself is not a bar to a subsequent prosecution (see *Frisbie* v.

*Collins* (1952) 342 U.S. 519 [96 L.Ed. 541, 72 S.Ct. 509]), argued that his presence in court where he could be identified by the victim was the fruit of an illegal detention. In part D of his opinion, Justice Brennan found it unnecessary to reach that issue since "in this case the record plainly discloses that prior to his illegal arrest, the police both knew [Crews'] identity and had some basis to suspect his involvement in the very crimes with which he was charged." (445 U.S. p. 475 [63 L.Ed.2d p. 548].) Five justices, however, refused to join this portion of Justice Brennan's opinion since it implied that the in-court identification might be inadmissible if the police had detained Crews without any basis whatever, or had arrested him for some crime other than those with which he was later charged. Justice Powell, joined by Justice Blackmun, announced that he would "reject explicitly . . . the claim that a defendant's face can be a suppressible fruit of an illegal arrest." (P. 447 [63 L.Ed.2d p. 549].) Justice White, joined by the Chief Justice and Justice Rhenquist, asserted that any contention that a defendant's appearance in court for identification is suppressible was foreclosed by precedent. (P. 479 [63 L.Ed.2d pp. 550-551].)

We find no basis to distinguish the present case from *United States* v. *Crews.* The victim in this case, like the victim in *Crews*, reported the crime to the police and provided them with a description of the robber before the illegal detention occurred. Although the trial court here made no formal finding that the victim's testimony at preliminary hearing was based upon his independent, untainted recollection of the crime,[7] the court's statements at the close of the hearing imply such a determination. Judge Patton stated expressly that "the court is satisfied that Mr. Cady was able to identify the defendants. He knew their physical appearance. But he did not know their name, and their names became known to him through the mugshots which were taken as a result of the . . . illegal stop . . . ."

It is clear from *United States* v. *Crews* that if the witness, relying upon his memory of the crime, is able to identify the defendant based upon his physical appearance, the testimony of the witness rests upon an adequate independent basis; the fact that the witness learned the defendant's name as a result of illegal police action is irrelevant. Judge Patton's determination that Cady could identify defendant's appearance apart from any information he acquired as a result of the illegal deten-

---

[7]Findings are not required in a hearing to suppress evidence under section 1538.5.

tion is therefore sufficient to establish that the identification testimony rested upon an independent and untainted source.[8]

Defendant argues that in the present case, unlike *Crews*, the police had no grounds to suspect him of the robbery prior to the illegal detention. This distinction, however, rests on that portion of Justice Brennan's opinion which was not joined by a majority of the justices. The concurring opinions of Justices Powell and White make it clear that a majority of the high court believe that an in-court identification, based upon the independent recollection of a witness known to the police before an illegal detention, is admissible whether or not the police suspected the defendant before the detention. (See *Thorne* v. *State of Arkansas* (1981) 274 Ark. 102 [627 S.W.2d 178].)

We conclude that *Crews* is controlling with respect to any contentions based on the federal Constitution, and compels us to reject defendant's premise that the admission of Cady's courtroom identification violated the Fourth Amendment. We therefore turn to defendant's alternative claim based on article I, section 13 of the California Constitution.[9]

■ In addressing this issue, we begin by reaffirming the now settled principle that the California courts, in interpreting the Constitution of this state, are not bound by federal precedent construing the parallel federal text; as we recently stated in *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779], the "state courts, in interpreting constitutional guarantees

---

[8]Substantial evidence supports the determination that Cady's trial identification rested upon his independent recollection of the robbery. Cady observed the robbers at close range for several minutes in a well-lighted store; he then identified defendant and his companion from an array of eight photographs shown him the morning after the robbery. Defendant does not claim that the photographic lineup was suggestive. (See *United States* v. *Crews, supra*, 445 U.S. 463, 473, fn. 18 [63 L.Ed.2d 537, 547].)

We recognize that at the time of the section 1538.5 hearing it was not clear that the independent source doctrine, which originated in cases involving suggestive lineups (see *United States* v. *Wade* (1967) 388 U.S. 218, 241-242 [18 L.Ed.2d 1149, 1165-1166]), would become the test of admissibility of an in-court identification following an illegal but nonsuggestive lineup. Accordingly on remand of this matter defendant should be afforded the opportunity to renew his motion to suppress. (Cf. *People* v. *Municipal Court* (1970) 10 Cal.App.3d 539 [89 Cal.Rptr. 243].)

[9]Article I, section 13, in language based upon the Fourth Amendment to the United States Constitution, provides that "The right of the people to be secure in their houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

contained in state constitutions, are '*independently responsible* for safeguarding the rights of their citizens.'" (P. 261, quoting *People* v. *Brisendine* (1975) 13 Cal.3d 528, 551 [119 Cal.Rptr. 315, 531 P.2d 1099].)[10] Decisions of the United States Supreme Court, nevertheless, are entitled to respectful consideration (*People* v. *Bustamante* (1981) 30 Cal.3d 88, 97 [177 Cal.Rptr. 576, 634 P.2d 927]; *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753]) and ought to be followed unless persuasive reasons are presented for taking a different course. ▮ In the present case, no reasons arise to justify rejecting the teaching of the Supreme Court in *Crews*.

First, nothing in the language or history of the California provision suggests that the issue before us should be resolved differently than under the federal Constitution. (Compare *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130 [164 Cal.Rptr. 539, 610 P.2d 436]; *People* v. *Anderson* (1972) 6 Cal.3d 628, 634-637 [100 Cal.Rptr. 152, 493 P.2d 880].)

Second, this is not a case in which the high court "hands down a decision which limits rights established by earlier precedent in a manner inconsistent with the spirit of the earlier opinion." (*People* v. *Bustamante, supra*, 30 Cal.3d 88, 97.) In such a case, we have stated, "Respect for our Constitution as 'a document of independent force' [citation omitted] forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter." (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108].) The issue before the Supreme Court in *Crews*, however, was one of first impression for that court; the decision did not overrule past precedent or limit previously established rights under the federal charter.

Third, we have on occasion been influenced not to follow parallel federal decisions by the vigor of the dissenting opinions and the incisive academic criticism of those decisions. (See *Committee to Defend Reproductive Rights* v. *Myers, supra*, 29 Cal.3d 252, 267, fn. 17; *People* v. *Bustamante, supra*, 30 Cal.3d 88, 100-101.) The high court decision in *Crews*, however, was unanimous, and has not inspired extensive criti-

---

[10]In *Committee to Defend Reproductive Rights* v. *Myers, supra*, 29 Cal.3d 252, 261, footnote 4, we listed numerous cases, beginning with *People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855], in which this court has construed the California Constitution as providing greater protection than that afforded by parallel provisions of the federal Constitution.

cism. The principles on which it rests—that an illegal detention does not bar prosecution, and that proof that testimony rests on an independent source will justify its admission despite prior police illegality—are well established. Indeed once courts move beyond the earlier theory that proof of a direct line of causation from an illegal search to the testimony of a witness to the crime automatically compelled suppression of the witness' testimony—a point which this court reached in *Lockridge* v. *Superior Court, supra*, 3 Cal.3d 166—the holding in *Crews* follows logically from those principles.

Finally, the Supreme Court decision in *Crews*, if followed by the courts of this state, would not overturn established California doctrine affording greater rights to the defendant. To the contrary, as we will explain, past California precedent is consistent with the principles set out in *Crews*.

Prior to our first *Teresinski* opinion, the leading California decision on the *Crews* issue was *Lockridge* v. *Superior Court, supra*, 3 Cal.3d 166.[11] In *Lockridge*, police investigating a jewelry store burglary obtained a warrant and searched an apartment. The search uncovered a gun stolen two years earlier, and by tracing the serial number of the gun the police located the victims of that earlier robbery. The victims identified photographs of defendants and subsequently identified defendants at preliminary hearing. In the burglary case, however, an appellate court had already held the search warrant invalid (*Lockridge v. Superior Court* (1969) 275 Cal.App.2d 612 [80 Cal.Rptr. 223]); defendants therefore moved to suppress the victims' testimony as the fruit of an illegal search.

We denied the request for mandate to suppress the identification testimony. Our opinion states that "The Pesces [the witnesses] were

[11]We note one earlier case. In *People v. Stoner* (1967) 65 Cal.2d 595 [55 Cal.Rptr. 897, 422 P.2d 585], the defendant was compelled at a lineup to wear clothing seized in an illegal search. The witness identified defendant in the lineup and again at trial. Holding the trial testimony admissible, we stated that: "[T]he fruit-of-the-poisonous-tree doctrine has not been invoked when the alleged fruit is testimony of a witness to a crime whose identity was not learned through police misconduct.... Even if Greeley's courtroom identification was dependent in part on his viewing defendant in illegally obtained clothing at the showup, it was "'sufficiently distinguishable to be purged of the primary taint.'" (*Wong Sun v. United States, supra*, [371 U.S. 471] at p. 488 [9 L.Ed.2d 441, 83 S.Ct. 407], quoting J. Maguire, Evidence of Guilt (1959) p. 221.)" (65 Cal.2d at p. 602.)

already known to the police as the victims of an unsolved robbery. Their gun was found as the result of a search conducted ... during the course of a police investigation of totally unrelated crimes.... [I]t was pure happenstance that during an investigation of other crimes, the police came across the gun taken in the Pesce robbery. The purpose of the exclusionary rule is to deter unlawful police conduct. [Citations.] In the present case, that purpose was adequately served by suppressing the gun and the evidence of the other crimes that the police were seeking. That purpose would not be further advanced by suppressing the testimony of the known victims of the Pesce robbery; testimony that unquestionably would have been admissible to establish petitioners' guilt of that crime, but for the chance disclosure of their connection therewith during a wholly unrelated police investigation" (3 Cal.3d at pp. 170-171.)[12]

*Lockridge* provides a close parallel to the present case. In both cases, an unlawful search during a police investigation of an unrelated matter (the jewelry burglary in *Lockridge*, a curfew violation in the present case) led by chance to the discovery of physical evidence linking defendants to a prior robbery. In both the victims of the robbery were not discovered as a result of the unlawful search,[13] but were known to the police before that search occurred.

Thus the *Crews* decision does not threaten to overturn a settled line of California precedent but, to the contrary, leads to results consistent with the leading California cases. Thus, those decisions which rely upon independent state grounds in order to preserve consistency in California law and protect established state doctrine (see *People* v. *Pettingill, supra*, 21 Cal.3d 231; *People* v. *Longwill, supra*, 14 Cal.3d 943) are inapposite in the present case.

---

[12]Subsequent California cases have followed the reasoning of *Lockridge*. In *People* v. *McInnis, supra*, 6 Cal.3d 821, we held that robbery victims could identify a defendant in court even though the victims first identified him on the basis of a photograph taken after an illegal arrest. *People* v. *Griffin* (1976) 59 Cal.App.3d 532 [130 Cal.Rptr. 648], on similar facts, reached the same result.

[13]The trial court attempted to distinguish *Lockridge* on the ground that defendant in the present case was arrested, booked, and photographed in connection with the investigation of the Seven-Eleven robbery, while defendants in *Lockridge* were arrested, booked, and photographed for the jewelry burglary. Although we endorsed that distinction in our prior opinion, its validity is open to question. The illegal police conduct in the present case, which gave rise to the suppression motion, concerns the initial detention, not the arrest or subsequent booking and photographing. That detention occurred during an investigation of a suspected curfew violation before the detaining officer was even aware of the Seven-Eleven robbery.

We conclude that this court should adopt the reasoning of *United States* v. *Crews* to define the rights of a defendant under article I, section 13 of the California Constitution. As we said in *Lockridge* v. *Superior Court, supra,* 3 Cal.3d 166, 171, the purpose of the exclusionary rule is adequately served by suppressing the physical evidence seized by the officer as a result of the illegal detention. That purpose would not be significantly furthered by additionally suppressing the testimony of a witness who was not discovered as a result of unlawful police conduct, and whose testimony rests upon his independent memory of the robbery.[14]

In accord with that conclusion, we hold that the superior court correctly suppressed both the physical evidence seized at the time of the illegal detention and the testimonial evidence that Cady, the robbery victim, identified defendant's photograph the morning after the robbery. The court erred, however, in suppressing Cady's testimony identifying defendant at the preliminary hearing. Since that testimony was sufficient to establish probable cause to believe that defendant committed the charged robbery, the court also erred in dismissing the action against defendant.

The judgment (order of dismissal) is reversed, and the matter remanded for further proceedings consistent with this opinion.

Bird, C. J., Mosk, J., Newman, J., Kaus, J., and Tobriner, J.,* concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the judgment reversing the order of dismissal pursuant to *United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244]. As explained by the majority, the identification testimony at issue here was admissible under *Crews* as the independent product of the victim's observation of defendant during the robbery.

---

[14]The *Crews* decision, in noting that the arrest in that case was not a sham or pretext (see 445 U.S. 464, 468, fn. 5 [63 L.Ed.2d 537, 543-544]), implied a limit to the admissibility of evidence under that decision. If an arrest were a sham or pretext, employed merely as a device to secure a defendant's person or photograph for identification, the deterrant purpose of the exclusionary rule might require the suppression of in-court identification testimony.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

I respectfully dissent, however, from that portion of the opinion which concludes that the arresting officer lacked an objectively reasonable basis for detaining defendant. For the reasons well expressed by Justice Manuel in his dissenting opinion in this case (26 Cal.3d at pp. 465-466), in which I concurred, the detention was proper. As Justice Manuel explained: "Circumstances short of probable cause to make an arrest may justify an officer stopping pedestrians or motorists for questioning. (*In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957]; *People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632]; *Cunha* v. *Superior Court* (1970) 2 Cal.3d 352, 355 [85 Cal.Rptr. 160, 466 P.2d 704]; *Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 426-427 [82 Cal.Rptr. 484, 462 P.2d 12]; *People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 95-96 [41 Cal.Rptr. 290, 396 P.2d 706].) As stated in *Tony C.*, the application of the rules is based on a determination of '"the reasonableness *in all the circumstances* of the particular governmental invasion of a citizen's personal security." (*Terry* v. *Ohio* [1968] 392 U.S. at p. 19 [20 L.Ed.2d at p. 904]).' (21 Cal.3d at p. 892; italics added.)

"In the present case there was an abundance of objective facts that justified Officer Rocha's honest and strong belief that the occupants of the vehicle might be in violation of the curfew and ordinance. (See *In re Nancy C.* (1972) 28 Cal.App.3d 747 [105 Cal.Rptr. 113].) He observed a car he did not recognize, apparently occupied by juveniles, driving between 2 and 3 a.m. in the business district of a relatively small town. Although he knew that the curfew law contained a provision exempting juveniles traveling to or from 'some lawful business or place or dance,' he had no way of determining whether the exception applied without detaining and questioning the occupants of the vehicle. In light of the strong possibility that the exception did not apply, such detention and questioning was fully justified. In my opinion, there can be no question of 'the reasonableness in all the circumstances of the particular governmental invasion.'"

Appellant's petition for a rehearing was denied April 15, 1982. Reynoso, J., did not participate therein. Richardson, J., was of the opinion that the petition should be granted.