The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Vernon T. SUTTLES, Defendant-Appellee.

Nos. 83SA347, 83SA348, 83SA349.

Supreme Court of Colorado, En Banc.

July 16, 1984.

Rehearing Denied Aug. 7, 1984.

Norman S. Early, Jr., Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist Atty., Neal A. Richardson, Deputy Dist. Atty., Denver, for plaintiff-appellant.

David F. Vela, State Public Defender, Robin Desmond, David P. Joyce, Deputy State Public Defenders, Denver, for defendant-appellee.

ROVIRA, Justice, delivered the Opinion of the Court in Part I and Part IIA and announced the Judgment of the Court in Part IIB.

The defendant, Vernon T. Suttles, is charged in three criminal cases with four counts of aggravated robbery[1] and violent crime.[2] He filed motions to suppress evidence in all of the cases. After a consolidated hearing, the trial court concluded that the police had no reasonable suspicion to stop or probable cause to arrest him. The court then suppressed all testimony from the victims of the four robberies establishing an in-court identification of the defendant. It also suppressed a chrome-plated revolver and an earring found in the back of the automobile in which Suttles was riding as a passenger before his arrest. The People filed this interlocutory appeal pursuant to C.A.R. 4.1. We reverse.

## I.

The evidence introduced at the suppression hearing established that, prior to December 22, 1982, a series of armed robberies of convenience stores, gas stations, and fast-food restaurants had taken place in Denver. The robbers were identified as two black men, one of whom always wore a brown leather jacket and carried a chrome-plated revolver. In an effort to identify and apprehend the robbers, Detective Chris Erickson installed a camera in a business known as "Swede's Place." As anticipated, Swede's Place was robbed on November 1, 1982, and several photographs of the robbers were taken. One photograph showed one of the robbers to be a black male wearing an earring in his left ear and a brown leather jacket. Another photograph showed the same robber carrying a

---

1. § 18–4–302, 8 C.R.S. (1978).

2. § 16–11–309, 8 C.R.S. (1983 Supp.).

chrome-plated revolver in his right hand. The first photograph only showed a small portion of the man's face, however, and could not be used for a positive identification. The second photograph was cut off at the shoulder.

The first photograph and a circular describing the modus operandi of the robbers were widely circulated throughout the Denver Police Department. The circular described the robbers as two black males, ages 23–25, approximately 5' 10" and 6' tall, each weighing one-hundred sixty pounds, one with curly black hair and a mustache, and the other with an "afro." It also noted the brown coat, the chrome-plated revolver, and a white, or blue and white vehicle.

On December 22, 1982, Officers David Castellano and John Schwab were on duty wearing plain clothes and driving an unmarked police car. As they left a Denver restaurant at approximately 5:00 p.m., Officer Schwab saw three black males in a blue and black automobile parked near a gas station. At least two of the men wore plastic shower caps on their heads. Schwab drove the police car to within five feet of the parked automobile and saw one of the men, later identified as the defendant, Suttles, sitting alone in the back seat. He testified that Suttles was wearing clothing that he thought matched the description in the police department circular. Officer Castellano also observed the automobile and its passengers. He testified that the person in the back seat was wearing a brown coat that looked like the brown coat in the photograph of the robber taken at Swede's Place.

When the automobile started moving, the officers followed it for about thirty-five blocks. At some point during the surveillance, they decided to stop the vehicle. Before doing so, however, they radioed for back-up assistance because their unmarked car did not have emergency equipment. A back-up unit arrived just as the suspect automobile stopped at a gas station. The driver, later identified as Jesse Fuller, the owner of the car, went into the gas station. Officer Schwab parked the police car and walked toward the driver's side of the automobile, while Officer Castellano went over to the passenger's side. Castellano testified that the passenger in the front seat, later identified as Houston Broadnex, had a coat "underneath his left leg and part of the coat exposed on his right leg," in which the officer observed the silhouette of a gun. Castellano allegedly grabbed the coat, felt the gun, and ordered Broadnex and Suttles not to move. He then ordered the two men out of the car and, after searching the car's interior, found a knife and a chrome-plated revolver under the back seat.

Broadnex testified on behalf of the defendant. He stated that Castellano approached the car with a drawn gun and ordered him first to put his hands on the dashboard and then to get out of the car. Immediately afterward, the officer ordered Suttles out of the car and asked both of them for identification. Broadnex testified that his coat was on the floor, not on his lap, and that the gun was not discovered in his coat until after he had gotten out of the car.

Following the arrest and search, Suttles was taken to police headquarters, where he was interviewed[3] and photographed. An officer noticed that Suttles' left ear was pierced. He therefore contacted the officers still at the scene and told them to look for an earring, which they subsequently found on the floor in the back of the car. No testimony was introduced at the suppression hearing concerning ownership of the earring. Using the photograph taken of Suttles, the police then conducted a pho-

**3.** After arresting the defendant, the police gave appropriate *Miranda* warnings and then interviewed Suttles about the chrome-gun robberies. In exchange for a promise that only the four robberies at issue in this case would be filed against him, the defendant admitted committing seventeen or eighteen of the other robberies. The agreement was consumated by a document dated January 5, 1983, signed by Detective Erickson and Deputy District Attorney David Heckenbach.

tographic lineup with the four victims of the robberies for which the defendant was later charged. All of the victims identified the defendant as being one of the robbers. Besides moving to suppress the gun and the earring, Suttles also moved to suppress

"any and all evidence of or resulting from any photo display or lineup and any courtroom identification of the Defendant on the grounds that any previous identifications were ... so suggestive as to be in violation of Defendant's right to due process and any courtroom identification at trial would be the result of previous improper identifications."

The trial court concluded that the defendant's arrest was unlawful. It found that Officers Schwab and Castellano, with only a "generic description" of the robbers, acted on "good police instinct" in deciding to follow the suspect automobile; however, instinct cannot take the place of reasonable suspicion to stop or probable cause to arrest the defendant. According to the court:

"[W]hen Officer Castellano went over [to the stopped car], I find that he placed the defendants under arrest. I find then he said at that time, 'Freeze. Put your hands on the front seat.' Mr. Broadnex did that. Mr. Suttles did it, at which point Officer Castellano, admittedly with gun drawn, ordered the men out of the car. They got out of the car. They were frisked. Nothing was found on them, at which point Officer Castellano and Officer Schwab, without probable cause and without a warrant, searched the vehicle they were in.

"Officer Castellano stated earlier he had gotten an excellent view or good view of the coat that Mr. Suttles was wearing in the back seat and hinged the reasonableness of the stop on the fact that this coat, according to Castellano, matched or was almost identical to the coat he had seen pictured in the robberies and stickups at Swedes and other places. The defense has shown through credible visual evidence [4] that that view was simply not available to the officers, and I so find. Until Mr. Suttles was actually removed from the car, there simply was no way to get a view of that coat...."

Based on these findings, the trial court suppressed the chrome-plated revolver and the earring, Suttles' jacket and jeans, all statements made to the police, each of the pretrial identifications based on the photographic line-ups, and all prospective in-court identifications by the victims of the robberies. On the issue of whether Suttles had standing to challenge the search and seizure, the court concluded that

"Suttles has a possessory and proprietary interest in certain of the items. He does not in Broadnex' coat and gun. He does and it has been shown through the evidence here that he has had and did have a proprietary interest in the gun when he claimed that the gun was his and he found it at another place, certainly the jacket, the leather jacket that he was wearing and the earring which was later admitted to be his. So I think the issue of standing has been met here."

On the issue of whether future in-court identifications should be suppressed, the court found that the photographic line-ups were not suggestive. It stated that it had looked at the photographs and that "the array is adequate for constitutional purposes." The following exchange then took place:

"THE COURT: What's left?

[DEFENSE COUNSEL]: Is the Court suppressing in-court identification?

THE COURT: The People didn't put on any evidence of independent source.

[DEFENSE COUNSEL]: I agree, but I don't think that is something that they need do unless the photographic lineup is found to be suggestive.

THE COURT: I don't see how any evidence of in-court identification can come

---

**4.** Suttles introduced a videotape reenactment of the surveillance and stop, which indicated that a person passing by or following the blue and black automobile would have had difficulty observing the clothing of a passenger in the back seat.

in on this record. It's also the fruit of the poisonous tree as to [the victims of the robberies]."

## II.

The issue in this case is not whether the defendant's arrest was supported by probable cause. The People accept the findings of fact of the trial court that there was no probable cause to arrest the defendant or to search the car. The issue is whether the trial court made erroneous conclusions of law once having found a lack of probable cause to arrest.

## A.

First, the People claim that the trial court erred in suppressing all prospective in-court identifications by the victims of the robberies. They argue that, since the court found the photographic lineup to be constitutionally valid, not tainted by any suggestivity on the part of the police, and since the court had jurisdiction over the person of the defendant, it should have permitted the victims the opportunity to testify at trial. The defendant argues that, since the People introduced no independent evidence of the victims' ability to identify him, the trial court correctly suppressed any in-court identification as the fruit of his illegal arrest. We agree with the People.

■ The independent source doctrine was developed to encompass those situations in which the trial court has made a determination that pretrial identification procedures are so suggestive as to be constitutionally tainted. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *People v. Mack,* 638 P.2d 257 (Colo.1981). Under these circumstances, a subsequent in-court identification by the witness is permissible only if the People can show by clear and convincing evidence that the in-court identification is not the product of the unconstitutional procedure but, rather, is based upon an independent source such as the witness' observations of the accused during the commission of the offense. *Foster v. Cali-*

*fornia,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *People v. Madonna,* 651 P.2d 378 (Colo.1982); *Gimmy v. People,* 645 P.2d 262 (Colo.1982); *People v. Mattas,* 645 P.2d 254 (Colo.1982).

■ Here, the trial court specifically found no suggestivity in the photographic lineup shown to the robbery victims. Consequently, the predicate for application of the independent source doctrine is missing. This conclusion does not resolve matters, however, because, even though the suppression hearing focused largely on whether or not the photographic lineup was suggestive, the trial court did not suppress the prospective in-court identifications for that reason. Rather, it suppressed them as the fruit of the defendant's illegal arrest. Conceding that the photographic lineup is a suppressible fruit of the defendant's unlawful arrest, the question that still remains is whether the victim-witnesses have sufficient independent recollection of the robberies to identify the defendant at trial. A determination of this sort is similar to, but separate from, any discussion of suggestivity and the independent source rule. Based on the evidence presented at the suppression hearing, we are unable to answer this question. We therefore reverse the order suppressing any in-court identification and remand to the trial court for further proceedings. *See People v. Franklin,* 640 P.2d 226 (Colo.1982) (cause remanded for resolution of suppression issue under proper standard).

By way of guidance, the trial court should consider the opinion of the United States Supreme Court in *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In *Crews,* the defendant was convicted of armed robbery. The issue on appeal was essentially the same as in this case: whether a robbery victim's in-court identification of the defendant should be suppressed as the fruit of an illegal arrest. The factual background was also similar. A young man robbed three women at gunpoint. Several days later, police officers arrested the defendant without probable cause, took his photograph,

and then conducted photographic lineups with two of the victims. Both women immediately identified the defendant as their assailant.

At a suppression hearing, the trial court ruled that the photographic identifications were products of an unlawful arrest and, accordingly, could not be introduced at trial. The court, however, allowed the victims to testify at trial, since, in its view, their "ability to identify [the defendant] in court was based upon independent recollection untainted by the intervening identifications." *Id.* at 468, 100 S.Ct. at 1248. The defendant was convicted, but the District of Columbia Court of Appeals reversed, holding that, but for the defendant's unlawful arrest, the police would not have obtained his photograph. Finding that the in-court identification was the product of official misconduct, the court concluded that the in-court identification testimony should have been excluded. *Crews v. United States*, 389 A.2d 277 (D.C.1978).

The United States Supreme Court unanimously reversed. It distinguished the usual or typical "fruit of the poisonous tree" case, where the challenged evidence was acquired after some initial fourth amendment violation, from a case where the victim is available to testify and the defendant is in the courtroom. The Court stated:

"A victim's in-court identification of the accused has three distinct elements. First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender. In the present case, it is our conclusion that none of these three elements 'has been come at by exploitation' of the violation of the defendant's Fourth Amendment rights. *Wong Sun [v. Unit-*

*ed States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) ].

### A

"In this case, the robbery victim's presence in the courtroom at respondent's trial was surely not the product of any police misconduct. She had notified the authorities immediately after the attack and had given them a full description of her assailant. The very next day, she went to the police station to view photographs of possible suspects, and she voluntarily assisted the police in their investigation at all times. Thus this is not a case in which the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused. Here the victim's identity was known long before there was any official misconduct, and her presence in court is thus not traceable to any Fourth Amendment violation.

### B.

"Nor did the illegal arrest infect the victim's ability to give accurate identification testimony. Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber. No part of this process was affected by respondent's illegal arrest. In the language of the 'time-worn metaphor' of the poisonous tree, *Harrison v. United States*, 392 U.S. 219, 222 [88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047] (1968), the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.

"This is not to say that the intervening photographic and lineup identifications—both of which are conceded to be suppressible fruits of the Fourth Amendment violation—could not under some circumstances affect the reliability of the in-court identification and render it inad-

missible as well.... But in the present case the trial court expressly found that the witness' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record. In short, the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity."

*Crews*, 445 U.S. at 471–73, 100 S.Ct. at 1250–51. (footnotes omitted).

The Court concluded by holding that the defendant's person and his presence at trial could not be considered fruits of his unlawful arrest, thereby foreclosing the prosecution from proving his guilt by independent, untainted evidence.

The trial court in this case should receive additional testimony and determine whether the robbery victims have an "independent recollection ..., uninfluenced by the [tainted] pretrial identifications." *Id.* at 473, 100 S.Ct. at 1251. If so, the court should allow the victims the opportunity to make an in-court identification of the defendant. *See United States v. Humphries*, 636 F.2d 1172 (9th Cir.1980) (even though the witness' pretrial identification of the defendant was based on information and photographs obtained from the defendant's illegal arrest, the witness' ability to identify the defendant in court 'has not been come at by exploitation' of that illegal arrest); *Illinois v. Payne*, 98 Ill.2d 45, 74 Ill.Dec. 542, 456 N.E.2d 44 (1983) (even though the defendant's arrest was invalid, there was an independent basis for the in-court identification); *People v. Teresinski*, 30 Cal.3d 822, 640 P.2d 753, 180 Cal.Rptr. 617 (1982) (if the witness, relying upon his memory of the crime, is able to identify the defendant based upon his physical appearance, the testimony of the witness rests upon an adequate independent basis).

## B.

Second, the People claim that the trial court erred in suppressing the chrome-plated revolver and the earring found in the back of the automobile, owned by Fuller, in which the defendant was riding as a passenger. They argue that Suttles had no legitimate and reasonable expectation of privacy in the car or in the items seized and, consequently, that he did not have standing to challenge the search.

The trial court held that the defendant had standing because he claimed a possessory and proprietary interest in the chrome-plated revolver and the earring. This conclusion, however, assumes too much. The only basis for the court's ruling that the defendant had a possessory interest in the gun was the hearsay testimony of Detective Erickson and Officer Ortiz. Erickson testified that, after his arrest, Suttles said that he "found the gun behind the K.C. Lounge." Ortiz testified that Suttles said he "found the gun over by the K.C. Lounge, inside a jacket." The trial court's reference to the earring and the claim that the defendant admitted it to be his is wholly without support in the record. Officer Ortiz testified that, at some point after the arrest, he noticed that Suttles' left ear was pierced. Remembering the photograph taken at Swede's Place, which showed the robber with an earring in his left ear, Ortiz contacted the officers at the scene of the arrest and asked them if they had seen an earring. They reported that an earring had been found on the floor in the back of the vehicle. Ortiz then told them to retain the earring as evidence. The trial court concluded that the testimony at the suppression hearing resolved the matter of Suttles' standing to object to the search and seizure. We disagree.

Since at least 1978, when the United States Supreme Court decided *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the proponent of a motion to suppress has the burden of establishing that his own fourth amendment rights were violated by the search and seizure. *See Alderman v. United States*, 394

U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Establishment of such a violation gives an individual "standing" to challenge the legality of the search and seizure. *People v. Spies,* 200 Colo. 434, 615 P.2d 710 (1980); *People v. Pearson,* 190 Colo. 313, 546 P.2d 1259 (1976). Before *Rakas,* an individual could meet the burden by demonstrating that he was "legitimately on [the] premises where a search occurs." *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960). After *Rakas,* this test no longer applies. For purposes of standing, the focus is now on whether the proponent of a motion to suppress had a legitimate expectation of privacy in the area searched or in the items seized. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *People v. Savage,* 630 P.2d 1070 (Colo.1981); *People v. Little,* 198 Colo. 244, 598 P.2d 140 (1979).

In *Rakas,* a police officer observed what he thought might be the getaway car used in a local robbery. He followed the car and called for back-up assistance. When additional officers arrived, they stopped the suspect vehicle, ordered its occupants out, and searched the car's interior. Upon finding a box of rifle shells in the locked glove compartment and a sawed-off rifle under the front passenger seat, the officers arrested the car's occupants. Before trial, several of the passengers moved to suppress the shells and rifle, claiming that the search of the car violated the fourth amendment. They conceded that they did not own the car, the shells, or the rifle. The trial court denied the motion to suppress, and on appeal after conviction, the Appellate Court of Illinois affirmed. It held that "without a proprietary or other similar interest in an automobile, a mere passenger therein lacks standing to challenge the legality of the search of the vehicle." *People v. Rakas,* 46 Ill.App.3d

569, 571, 4 Ill.Dec. 877, 878, 360 N.E.2d 1252, 1253 (1977).

The United States Supreme Court affirmed, based on its determination that being "legitimately on [the] premises," without more, no longer conferred standing in fourth amendment cases. The Court instead borrowed from *Katz* and held that the test should be whether the person challenging the search and seizure had a legitimate expectation of privacy in the invaded place. According to the Court, this concept means something more than a subjective expectation of not being discovered. "Legitimation of expectations of privacy by law," it explained, "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas,* 439 U.S. at 144 n. 12, 99 S.Ct. at 430 n. 12. The Court concluded:

> "Judged by the foregoing analysis, petitioners' claims must fail. They asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized. And as we have previously indicated, the fact that they were 'legitimately on [the] premises' in the sense that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched.... [Petitioners] made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy."

*Id.* at 148–49, 99 S.Ct. at 432–33.[5]

In several recent cases, we have adhered to the basic principles set out in *Rakas.* In

---

**5.** The dissent in *Rakas* criticized the Court's opinion for emphasizing property interests as a key to interpreting expectations of privacy. According to the dissent:

> "[T]he Court ... effectively ties the application of the Fourth Amendment and the exclusionary rule in this situation to property law concepts. Insofar as passengers are con-

*People v. Spies*, 200 Colo. 434, 615 P.2d 710 (1980), we instructed the trial court on remand to make further findings to determine whether the defendant, who was arrested entering an allegedly stolen car, had a legitimate expectation of privacy in the car at the time of the search. "Such a determination," we noted, "is appropriately based upon the totality of the circumstances in each case." *Id.* at 440, 615 P.2d at 714. If the car was stolen and the defendant knew it was stolen, he could have no expectation of privacy which the law would recognize as legitimate. In *People v. Henry*, 631 P.2d 1122 (Colo.1981), we reversed an order suppressing evidence seized during two consent searches of a car in which the defendant was riding as a passenger. The trial court had held that the defendant had a legitimate expectation of privacy in the car by virtue of his mere presence as a passenger. We disagreed, in part because the defendant neither asserted nor established a property interest in the car or in the objects seized during the search. "Contrary to the trial court's ruling," we concluded, "the defendant's mere occupancy of the vehicle as a passenger, without more, is insufficient to provide him a constitutionally cognizable expectation of privacy in the area searched or the objects seized. *Rakas v. Illinois*, 439 U.S. 128 [99 S.Ct. 421, 58 L.Ed.2d 387] ... (1978)." *Henry*, 631 P.2d at 1129.

Based on the test outlined in *Rakas,* we are satisfied that Suttles did not have a legitimate expectation of privacy, and consequently does not have standing, to challenge the search of Fuller's car and the seizure of the gun and the earring. The only evidence of any kind of proprietary or possessory interest on Suttles' part was the hearsay testimony that Suttles claimed to have found the gun at a bar. Even if we accept the fact that Suttles, through two police officers, has asserted a possessory

interest in the gun, that interest, and the method used to establish it, appear tenuous at best.[6] *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (petitioner's alleged ownership of drugs seized from a companion's purse is but one fact to be considered; petitioner must still demonstrate a legitimate expectation of privacy in the invaded place). At the same time, the record reflects that Suttles has not claimed even a tenuous interest in either the car or the earring. We conclude, therefore, that Suttles is without standing to challenge the seizure of the gun and the earring. Accordingly, the trial court's order suppressing these items is reversed.

The cause is remanded for further proceedings consistent with the views expressed herein.

LOHR, J., specially concurs.

ERICKSON, C.J., and KIRSHBAUM, J., join in the special concurrence.

QUINN, J., dissents in part.

DUBOFSKY and NEIGHBORS, JJ., join in the dissent.

LOHR, Justice, specially concurring.

I concur in the majority opinion except for part IIB and concur in the result reached in that part, i.e., that the trial court erred in suppressing the chrome-plated revolver.

I agree with the conclusion reached in Justice Quinn's dissent that the record demonstrates sufficiently that the defendant had a possessory interest in the revolver. This interest gave him standing to contest the seizure of the revolver, but not the search of the car. *See United States v. Lisk,* 522 F.2d 228 (7th Cir.1975). Under these circumstances "the case is the same

---

cerned, the Court's opinion today declares an 'open season' on automobiles. However unlawful stopping and searching a car may be, absent a possessory or ownership interest, no mere 'passenger' may object, regardless of his relationship to the owner."

*Rakas,* 439 U.S. at 156–57, 99 S.Ct. at 437–38 (White, J., dissenting).

6. In *Spies,* 615 P.2d at 713, the defendant submitted an affidavit in which he claimed a possessory interest in the automobile he was charged with stealing.

as though the [revolver] had been found in plain view in a public place and then seized." *Id.* at 230 (footnote omitted). "[T]he defendant may only contend that the police lacked grounds to believe that the [revolver was] connected with criminal activity or some other lawful basis for seizure." 3 W. LaFave, *Search and Seizure* 563 (1978) (footnote omitted). The record demonstrates that the police had ample grounds to believe the revolver was connected with the robberies with which the defendant was later charged. Thus, the seizure of the weapon was constitutionally reasonable.

ERICKSON, C.J., and KIRSHBAUM, J., join in this special concurrence.

QUINN, Justice, dissenting in part.

I respectfully dissent from part IIB of the majority opinion, which holds that the defendant has no standing to challenge the seizure of the revolver from the automobile in which he was riding as a passenger.

I view the evidence in this case as demonstrating a sufficient possessory interest by the defendant in the revolver as to establish a legitimate expectation of privacy in that object. Before a defendant may challenge the constitutional legitimacy of a governmental search or seizure, "he must first establish that the challenged search violated a privacy interest which the Fourth Amendment is designed to protect." *People v. Henry,* 631 P.2d 1122, 1129 (Colo. 1981). Fourth Amendment rights are infringed when governmental conduct violates the defendant's own legitimate expectation of privacy, rather than the privacy interests of third parties. *E.g., United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2443, 65 L.Ed.2d 468 (1980). Among the factors to be considered in this determination is the existence of a property or possessory interest in the seized article. *E.g., Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

In contrast to both *Rakas,* 439 U.S. 128, 99 S.Ct. 421, and *Henry,* 631 P.2d 1122, in which neither defendant asserted or established a property or possessory interest in articles seized from automobiles, the record here demonstrates that the defendant had a sufficient possessory interest in the revolver. Detective Ortiz, who was called as a defense witness, testified without objection to a custodial statement made to him by the defendant. The detective's testimony was as follows:

"He made a statement with regard to a chrome gun that was found in the rear seat, by where he was seated. He told me that he found the gun over by the K.C. Lounge, inside a jacket, and that he had taken the jacket and gun and placed them in his car. And later on, when he was picked up by the other two parties, they had taken the same jacket that had the gun in it and had placed it into this vehicle that they were stopped in by Officers Schwab and Castellano."

The content of the defendant's statement to Detective Ortiz was corroborated by Detective Erickson, who was also called as a defense witness and similarly testified without objection from the prosecution. Although the testimony was hearsay, there is nothing in the record indicating that the testimony was received for any purpose other than to establish the truth of the matters asserted in the defendant's statement.

Because the record demonstrates a sufficient possessory interest on the part of the defendant in the revolver, he has established a legitimate expectation of privacy in that object. I would therefore affirm that part of the trial court's ruling which suppressed the seizure of the revolver as the fruit of the unconstitutional arrest of the defendant.

I am authorized to say that JUSTICE DUBOFSKY and JUSTICE NEIGHBORS join me in this dissent.