[Crim. No. 21596. First Dist., Div. Four. Oct. 5, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCIANO CARPIO CHAVEZ, Defendant and Appellant.

218

**COUNSEL**

Louis C. Castro, under appointment by the Court of Appeal, and Iwama & Castro for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Ann K. Jensen, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

McCULLUM, J.*—Defendant Marciano Carpio Chavez was charged in count I of an information with assault with intent to commit rape (Pen. Code, § 220);[1] in count II with burglary (§ 459); and in count III with assault by means of force likely to produce great bodily injury. (§ 245, subd. (a).) In proceedings conducted pursuant to section 1368 et seq., he was found competent to stand trial. He thereupon entered negotiated pleas of guilty to counts I and III. Count II was dismissed, and the trial court sentenced him to state prison on counts I and III. He filed a notice of appeal from the judgment of conviction. The notice was timely, but a certificate of probable cause for the appeal was not re-

---

*Assigned by the Chairperson of the Judicial Council

[1]Statutory citations in this opinion are to the Penal Code except where expressly indicated otherwise.

quested or filed pursuant to section 1237.5.[2] The notice also did not include a statement of grounds for the appeal indicating that section 1237.5 did not apply. (Rule 31(d), Cal. Rules of Court.)[3]

Defendant is a Spanish-speaking Mexican national. He is illiterate, and neither speaks nor understands English. He principally contends on the appeal that the trial court committed constitutional error in failing to appoint competent interpreters for him at any stage of the prosecution, with the consequence that he was unable to understand the nature of the proceedings. He also contends that he was unconstitutionally denied the effective assistance of counsel, with regard to the court's failure to appoint interpreters and otherwise; that the determination that he was competent to stand trial was unsupported by substantial evidence; and that prejudicial errors were committed in the proceedings in which he was sentenced. ■ The People argue that he is barred from raising any of these issues, except the sentencing errors claimed, by reason of his failure to obtain a certificate of probable cause pursuant to section 1237.5 (See fn. 2 and the accompanying text, *ante.*)

The People's position is technically correct (*People* v. *Piñon* (1979) 96 Cal.App.3d 904, 910 [158 Cal.Rptr. 425]), but the present record demonstrates exceptional circumstances. Defendant was sentenced on June 26, 1980. G. Jack Benge, one of his attorneys (as will appear), filed a notice of appeal in defendant's name on July 2, 1980. The notice stated only that defendant appealed "from the judgment rendered against him on June 26, 1980," and that he "is indigent and he therefore requests that counsel be appointed to represent him in this appeal."

Also on July 2, 1980, Benge filed an "Affidavit ... In Support Of Defendant's Notice Of Appeal And Request For Appointment Of ...

---

[2]Section 1237.5 provides in pertinent part: "No appeal shall be taken by defendant from a judgment of conviction upon a plea of guilty ... except where: [¶] (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings; and [¶] (b) The trial court has executed and filed a certificate of probable cause for such appeal with the county clerk."

[3]Rule 31(d) provides in pertinent part: "If the appeal from a judgment of conviction entered upon a plea of guilty ... is based solely upon grounds ... occurring after entry of such plea which do not challenge the validity of the plea ..., the provisions of Section 1237.5 ... requiring a statement by the defendant and a certificate of probable cause by the trial court are inapplicable, but the appeal shall not be operative unless the notice of appeal states that it is based upon such grounds. [¶] The time for preparing, certifying and filing the record on appeal or for filing an agreed statement shall commence to run when the appeal becomes operative."

Counsel." The affidavit was executed by Benge under oath. After declaring that defendant had been sentenced to state prison on his pleas of guilty, as recited above, Benge alleged in pertinent part as follows: "Defendant Chavez is illiterate and unable to communicate in the English language. The defendant further suffers from a hearing impairment in one ear, and . . . is described as possibly functioning within the mental retardation stage. The defendant was transported to the state facility at Vacaville immediately after sentencing and was thus unable to further confer with counsel and to act in filing a notice of appeal . . . prior to his departure. The defendant is indigent. In order to safeguard defendant's right to appeal, I now act to file this notice . . . on behalf of the defendant and respectfully request that the appointment of . . . [counsel] . . . be made forthwith, the defendant being without funds or means to secure legal counsel."

The affidavit does not explain why counsel did not make the quoted allegations in a statement applying to the trial court for a certificate of probable cause pursuant to section 1237.5, subdivision (a). (See fn. 2, *ante*.) The allegations nevertheless stand uncontroverted in the record. If they had been incorporated in a statement pursuant to the statute, the trial court would have been required to consider—among other things—whether the asserted failure to appoint competent interpreters in the prosecution of this defendant (who cannot speak English and whose capacity to communicate is otherwise impaired) constituted a valid issue to be raised as a ground for appeal. That issue is significant because a non-English-speaking defendant's right to an interpreter is guaranteed by the California Constitution.[4] It therefore appears that the trial court would have executed and filed a certificate of probable cause as to the issue. For these reasons, we may consider its merits notwithstanding counsel's failure to invoke section 1237.5 in the trial court. (*People* v. *Chen* (1974) 37 Cal.App.3d 1046, 1048 [112 Cal.Rptr. 894], disapproved on another ground in *People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672]; see also *People* v. *Vest* (1974) 43 Cal.App.3d. 728, 731-732 [118 Cal.Rptr. 84] [appeal in noncompliance with § 1237.5 treated as petition for writ of habeas corpus and decided on merits].)

The decisions just cited have been criticized on the ground that they frustrate the principle of "judicial economy" which they purport to

---

[4]Article I, section 14, of the Constitution provides in pertinent part: "A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings." (New section adopted Nov. 5, 1974.)

serve, but which is the purpose of section 1237.5 itself. (*People* v. *Pinon, supra*, 96 Cal.App.3d 904 at pp. 908-909.) However, the above-quoted allegations in the affidavit filed by Attorney Benge would clearly entitle defendant to relief from his *default* in failing to comply with the statute. (Cf. *People* v. *Ribero* (1971) 4 Cal.3d 55, 64-66 [92 Cal. Rptr. 692, 480 P.2d 308].) That relief would involve our directing the preparation of a statement pursuant to section 1237.5, subdivision (a), at this time, and that the appeal proceed if the trial court thereupon executed a certificate of probable cause pursuant to subdivision (b) of the statute and rule 31(d). (See *People* v. *Ribero, supra*, at p. 66.)

Such action would inevitably result in the return to this court of an appeal which has already been briefed in full on its merits. The prospective consequences would defeat the principle of "judicial economy" in fact, and their equivalent was not involved or portended in any of the conflicting decisions previously cited. (See *People* v. *Pinon, supra*, 96 Cal.App.3d 904 at pp. 907-909; *People* v. *Chen, supra*, 37 Cal.App.3d 1046 at pp. 1048-1049; *People* v. *Vest, supra*, 43 Cal.App.3d 728 at pp. 731-732.) They warrant our consideration of the appeal at this time, notwithstanding the problem involving section 1237.5. We proceed accordingly.

Article I, section 14, was added to the Constitution in 1974. Before that, the courts had held that the appointment of an interpreter in criminal proceedings was required whenever it was "necessary" as a matter of due process. (See *People* v. *Annett* (1967) 251 Cal.App.2d 858, 861-862 [59 Cal.Rptr. 888]; *People* v. *Estany* (1962) 210 Cal. App.2d 609, 611 [26 Cal.Rptr. 757]; *In re Muraviov* (1961) 192 Cal. App.2d 604, 606 [13 Cal.Rptr. 466]; *People* v. *Hernandez* (1957) 150 Cal.App.2d 398, 400 [309 P.2d 969].) Article I, section 14, now grants a non-English-speaking defendant the distinct right to an interpreter "throughout the proceedings." (See fn. 4, *ante.*)

More than a dozen court appearances were made by defendant in the superior court. He was represented on these occasions by Mr. Benge (the affiant quoted above) or by Mr. Wagner, Benge's associate. Defendant first appeared on December 5, 1979, when he was arraigned on the information. Benge and Wagner appeared with him as defense counsel. Benge, who is apparently conversant in Spanish, was sworn and acted as an interpreter. Defendant did not enter a plea, and the cause was continued. On December 19, 1979, the criminal proceedings were suspended and proceedings were commenced on the question of defen-

dant's competence to stand trial. Reports from alienists were filed in January of 1980.[5] On January 9, through Benge, defendant waived a jury trial and other rights in the pending proceedings. The court thereupon found that he was competent to stand trial and ordered the criminal proceedings reinstituted. There is no indication in the record that anyone acted as an interpreter on this occasion.

Subsequent events occurred in 1980 as follows: As a result of the determination that defendant was competent to stand trial, a preliminary examination was conducted on January 24. He was held to answer, and he was again arraigned in the superior court on January 30. The record of this arraignment shows that defense counsel Benge was "acting as interpreter," but not that he was sworn. He waived a reading of the information, and no plea was entered. He appeared with defendant on subsequent occasions at which the cause was routinely continued. The record does not show whether Benge or anyone else acted as an interpreter on these occasions.

The case was called on April 9 for the entry of negotiated pleas. Benge, who was present with defendant as his attorney, suggested to the court that it would be "appropriate under the circumstances to have actually a translator for Mr. Chavez [defendant]." The court appointed Dolores Espinoza to act as an interpreter. After she was sworn, the court announced its understanding that negotiated pleas of guilty to counts I and III of the information were to be entered. While defendant was being questioned for this purpose, the interpreter stated that he (defendant) was not feeling well. The court continued the proceedings to the next day.

Benge was again present as defense counsel when the plea proceedings were resumed on April 10, but Juan Sanchez was sworn and acted as an interpreter. Several questions and comments by the court in the resumed proceedings were addressed to the interpreter with reference to defendant in the third person, but not to him directly, which meant that translation to him required paraphrasing by the interpreter.[6] Other

---

[5]In one of these reports, a court-appointed psychiatrist stated to the court as follows: "The defendant is Spanish-speaking only. I understand that his Spanish-speaking counsel was unable to clearly communicate with the defendant[,] raising questions of his competency to stand trial."

[6]Examples of this appear in the following exchange: "THE COURT: "... And he [defendant] remembers what I told him yesterday about his rights? THE INTERPRETER: Yes, your Honor. THE COURT: ... I had asked him if he understood that the choice of

questions and comments were addressed to defendant directly, but the record establishes that the responses were paraphrased without literal translation and with occasionally ambiguous results.[7]

Speaking through the interpreter, defendant entered a plea of guilty to count I without incident. When he was asked for his plea to count III, the interpreter communicated the paraphrased response that "[t]he defendant wants to plead not guilty to that charge, your Honor." After a private discussion with defendant at that point, Benge told the court that he (defendant) had now "indicated he understood better" and that he was "ready to enter a plea of guilty" to count III. The plea was thereupon entered. The court ordered defendant transferred to the California Medical Facility for diagnostic study and report pursuant to section 1203.03.

The case was called for sentencing on June 11. Attorney Wagner appeared with defendant, told the court that Benge was not available, and requested a continuance until Benge could be present. A Miss McGarvey, who worked in the district attorney's office, was asked to act as an interpreter after she had been identified as the "only interpreter in the building." She was not sworn, but the court requested that she ask defendant if he had any objection to the continuance. She replied (presumably after putting the question to defendant), "That is fine." A continuance of one day was ordered as requested.

Attorney Benge was present with defendant when the sentencing proceedings were called on June 12. Benge purported to waive an interpreter in the following exchange:

"THE COURT: Mr. Benge, do you need the assistance of an interpreter this morning?

---

a sentence would be up to the judge. Did he understand that? THE INTERPRETER: Yes, your Honor. THE COURT: Has anybody promised him leniency ... ? THE INTERPRETER: No, your Honor. THE COURT: Has anybody threatened him in any way .... ? THE INTERPRETER: No, your Honor."

[7]An example is shown in this exchange:

"THE COURT: "... [D]o you understand that *a recommendation* has been made for you to go to prison for 90 days so they can talk to you and make *a recommendation* to me as to whether you should stay in prison or whether you should be kept in jail here in Napa, or whether you should be placed on probation?

"THE INTERPRETER: The defendant says he understands *the recommendation*." (Italics added.)

"MR. BENGE: Originally I believed I did, your Honor. I think I can manage it this morning. My only concern is perhaps something other than the report would be brought up. My feeling is this morning we are here basically for sentencing. I think I can convey this to Mr. Chavez if this is acceptable to the Court.

"THE COURT: Well, we have been doing it in Mr. Chavez' case throughout, having you interpret, primarily because you seem to have established a rapport with him and an ability to communicate which many of our interpreters have had difficulty doing because of the factors noted in the ... [California Medical Facility] ... report, which the Court is also aware of. Frankly, I don't like the procedure, primarily because I think it puts you in an uncomfortable position of having to translate at the same time you are trying to listen, and to think, and to advocate on behalf of your client, but perhaps if you and your client are willing to waive a third-party interpreter present we can go ahead on the same basis that we have in the past.

"MR. BENGE: If I may just ask my client if he has any objection.... *It seems acceptable to my client, your Honor.*" (Italics added.)

A woman in the courtroom interrupted this exchange and asked to be heard on the question of the sentence to be imposed. She later addressed the court, stating (without being sworn) that she was the victim of one of the offenses charged; that it was a "very serious crime"; that defendant had been involved in other offenses not charged; and that the court should "consider a hard sentence." There is no indication in the record that these statements were translated to defendant as they were made. The proceedings were then continued to June 25 because, as the court put it, the matters raised by the victim were "frighteningly new" and required investigation. The court and Benge agreed that an interpreter should be present on June 25.

Benge appeared with defendant on June 25 and told the court that Juan Sanchez could not be located. The court referred to "a previous waiver of an interpreter," but stated that "the stakes were sufficiently serious in the matter and that there should probably be an interpreter present because it wasn't [*sic*] fair to Mr. Benge to try to translate and to listen and plan his defense at the same time." Benge said that he would "prefer to literally translate ... to the court" because defendant was "never very certain his words are being translated correctly." The

court continued the sentencing for one day to permit Juan Sanchez or another "court qualified" interpreter to be located.

Benge appeared with defendant on June 26. Oscar DeHaro was sworn to act as an interpreter on that day. He told the court that he was "in the process" of obtaining certification as an interpreter, but that he had not received it. Without speaking to defendant, Benge waived "any irregularity in having a translator who's not officially certified." The court instructed DeHaro to "provide a running translation," and proceeded to sentence defendant to state prison.

The foregoing summary clearly demonstrates that defendant did not have an interpreter "throughout the proceedings." In the first place, Evidence Code sections 750 and 751 require the administration of a precisely formulated oath to any person who is to act as an interpreter.[8] The statutory requirements are mandatory in a criminal prosecution. (See *People* v. *Johnson* (1975) 46 Cal.App.3d 701, 703-705 [120 Cal.Rptr. 372].) Dolores Espinoza, Juan Sanchez, and Oscar DeHaro were sworn before acting as interpreters. Miss McGarvey was not. Attorney Benge assumed the role of interpreter on several occasions, but he was sworn only once.

 When bilingual courtroom dialog is exchanged through an interpreter, literal translation should be exacted of him, without paraphrasing, because of undetectable differences which may exist between the words spoken and his understanding of their message. Correspondingly, a question or statement in English should be expressed directly to the individual who is to respond to it (not to the interpreter) and literally translated to the individual (not paraphrased) by the interpreter. The individual's responses should be literally translated back, without paraphrasing and as the interpreter heard it.[9] We have identified instances where these procedures were not employed in the present case, and where the consequent entries in the record cast doubt on the literal ac-

---

[8]These statutes respectively provide:

750. "A person who serves as an interpreter or translator in any action is subject to all the rules of law relating to witnesses."

751. "(a) An interpreter shall take an oath that he will make a true interpretation to the witness in a language that the witness understands and that he will make a true interpretation of the witness' answers to questions to counsel, court, or jury, in the English language, with his best skill and judgment. [¶] (b) A translator shall take an oath that he will make a true translation in the English language of any writing he is to decipher or translate."

[9]Some of these procedures for bilingual in-court interpretations are now prescribed in the Standards of Judicial Administration adopted by the Judicial Council. (See *id.*, § 18.1, subds. (a)(6), (a)(9), and (b)(1); *id.*, § 18.3, subd. (a).)

curacy of various translations to defendant in Spanish and from him in English. (See fns. 6 and 7, *ante.*) The court was told on June 26 that defendant himself was not "certain" that his own statements were "being translated correctly" in the proceedings. At several other points, the record does not establish that significant statements by others were translated to him as they were made. Before he entered a plea of guilty to count III on April 10, he demonstrated a lack of understanding of what he was doing.

It is true that attorney Benge functioned as an interpreter on significant occasions, but the statutory requirement of an oath was ignored on all but one of them. The court had been given reason to question the adequacy of communication between him and defendant in any event. (See fn. 5, *ante.*) Moreover, he continued to act as defense counsel on each occasion. It has been held that a non-English-speaking defendant's Fourteenth Amendment rights are satisfied if he is represented by counsel who is qualified to act as his interpreter. (*People* v. *Martinez* (1972) 71 Ill.App.3d 1075 [289 N.E.2d 76, 78]; see also *United States* v. *Rodriguez* (4th Cir. 1970) 424 F.2d 205, cert. den. 400 U.S. 841 [27 L.Ed.2d 76, 91 S.Ct. 83].) The Arizona Supreme Court has held, however, that the right to an interpreter—as such—is effectively denied if the attorney is required to act as interpreter and defense counsel at the same time. (*State* v. *Rios* (1975) 112 Ariz. 143 [539 P.2d 900, 901].) The following language used by that court is pertinent in the present case:

"The fact that the defense counsel was able to speak Spanish does not negate the fact that the appellants were denied an interpreter. For defense counsel to cross-examine witnesses, listen attentively to testimony and objections of the prosecuting attorney and hear rulings and remarks of the presiding judge and simultaneously render an accurate and complete translation to his three clients, is an impossible task. The effectiveness of defense counsel under those circumstances is obviously greatly impaired to the serious detriment of his clients' defense.

"'A defendant's inability to spontaneously understand testimony being given would undoubtedly limit his attorney's effectiveness, especially on cross-examination. It would be as though a defendant were forced to observe the proceedings from a soundproof booth or seated out of hearing at the rear of the courtroom, being able to observe but not comprehend the criminal process whereby the state had put his freedom in jeopardy. Such a trial comes close to being an invective against an insensible object, possibly infringing upon the accused's basic "right to be

present in the courtroom at every stage of his trial."' [citations omitted] *State v. Natividad*, 111 Ariz. at 194, 526 P.2d at 733." (*State v. Rios, supra*, 539 P.2d 900 at p. 901.)

This reasoning demonstrates that a right to an interpreter is effectively denied when a defense attorney must discharge the function, and that the right to counsel may be significantly impaired when he does. (See Chang & Araujo, *Interpreters for the Defense: Due Process for the Non-English-Speaking Defendant* (1975) 63 Cal.L.Rev. 801, 822.) The trial court perceived a problem in the present case, but only to the extent indicated by its remark that defense counsel's assumption of the interpreter's role "wasn't fair" to counsel. The above-quoted language of the Arizona Supreme Court is more to the point because it focuses on the consequences imposed on the accused. Adopting its reasoning for present purposes, we conclude that defendant was denied his constitutional right to an interpreter when his attorney acted as one. We have seen that the translating responsibilities of the third-party interpreters were not effectively discharged in several occasions, and that one of them acted without being sworn in compliance with statutory requirements. (See fn. 8, *ante.*) In sum, defendant was denied his constitutional right to an interpreter "throughout the proceedings."

■ The People contend that the right was waived on pertinent occasions. Before article I, section 14, was added to the Constitution, at least one California court had held that the appointment of an interpreter in criminal proceedings could be waived by failure to request it. (*People v. Von Mullendorf* (1952) 110 Cal.App.2d 286, 289-290 [242 P.2d 403].) The right to an interpreter having since been guaranteed in the Constitution, it may not validly be waived without an "affirmative showing," on the record, of a waiver which was "intelligent and voluntary" on the part of the affected defendant. (Cf. *Boykin v. Alabama* (1969) 395 U.S. 238, 242-243 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709]; *In re Tahl* (1969) I Cal.3d 122, 130 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den. 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708].)

No such showing appears in the present record. When defense counsel purported to waive the appointment of a third-party interpreter at the sentencing proceedings on June 12, the only communication to the court was counsel's conclusion that the prospect "seems acceptable to my client." Defendant did not participate in the communication. On June 26, he was apparently not consulted or informed when counsel purported to waive "any irregularity in having a translator who's not

certified." There is no indication in the record that defendant knowingly and intelligently waived the various other irregularities we have perceived on the occasions when third-party interpreters were actually used. The record fails to support the People's claim that his constitutional right to an interpreter was waived at any time.

The denial of the constitutional right requires reversal. The appeal having survived the failure to comply with section 1237.5, we need not discuss any dereliction by defense counsel in that regard. The claim of ineffective assistance of counsel in other respects need not be discussed because this opinion will guide defendant's attorney in future proceedings requiring bilingual translation. We do not reach other contentions on the appeal because the reversal sets them at large.

The judgment of conviction is reversed.

Rattigan, Acting P. J., and Christian, J., concurred.

On November 3, 1981, the opinion was modified to read as printed above.