[Civ. No. 22751. Third Dist. Oct. 2, 1984.]

In re DUNG T., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
DUNG T., Defendant and Appellant.

698

702

## Counsel

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Antonio D. Radillo, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, W. Scott Thorpe and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CARR, J.**—Dung T. appeals from an order of the Juvenile Court of San Joaquin County adjudging him a ward of the court (Welf. & Inst. Code, § 602), committing him to juvenile hall for 160 days, and requiring him to pay restitution to victims. The court found true allegations that appellant committed a robbery and personally used a firearm in its commission. (Pen. Code, §§ 211, 12022.5.) Appellant contends: (1) testimony of his lineup identification should have been suppressed as the product of an illegal detention; (2) the evidence was insufficient to support the findings of the trial court; (3) he was denied due process in that the proceedings were not adequately translated by a Cambodian interpreter; (4) he was denied his constitutional right to an interpreter throughout the proceedings when his interpreter was used without his consent to translate other witnesses' testimony; (5) he was denied effective assistance of counsel; (6) the court improperly required restitution as a condition of probation; and (7) the court imposed an excessive term of juvenile hall confinement.

We conclude appellant was denied his right to an interpreter throughout the proceedings and on that basis we shall reverse. We further conclude that in the event of a rehearing, the lineup identification of appellant must be suppressed as the product of an illegal detention.

### Facts

On the night of November 16, 1982, four Vietnamese males entered the apartment of a Cambodian family in Stockton and robbed its inhabitants at gunpoint. Three of the robbers had guns; one wore a mask. Dib Sounn, a Cambodian, was in the parking lot of the apartment complex when the robbery took place. He observed the robbers run toward a parked car, described as a Dodge, and enter it. Two people were already in the car. One of the robbers told him not to follow. As the car was driven away, it was followed by a yellow car identified as a Capri.

Officer Matthews of the Stockton Police Department investigated the incident. The robbers were described to him as six Vietnamese males in their early twenties. He obtained a description of the automobiles which they were seen entering. The following evening, Officer Matthews observed a parked unoccupied Dodge automobile fitting the description of the one used in the robbery. Dib Sounn was brought to the scene; he identified the Dodge as the one he observed. Officer Matthews kept the car under surveillance for three hours, after which he was advised by the detective bureau to make periodic checks on it and when the car was occupied to bring it down to the police station.

The following night, Officer Matthews observed the Dodge being driven. He stopped it and called for assistance. The car was occupied by eight young Vietnamese males, one of them appellant, then 15 years of age. Officer Matthews attempted to explain to the occupants of the car in English that they were possible suspects in a robbery. Some stated they understood while others stated they did not. When assistance arrived, the officers "loaded up the occupants, put them in police cars, transported them to the police facility and transported the car down."

At the police station, a Vietnamese interpreter was called in. Through the interpreter Sergeant Stewart explained to the occupants their rights, which they appeared to understand. Each waived his right to an attorney and agreed to participate in a lineup. The victims and witnesses were brought to the police station to view the lineup. One of the victims, Pheau Noun, a 13-year-old Cambodian who "appeared to be" fluent in English, explained to the witnesses in Cambodian that the persons they would view may or may not be the persons responsible for the robberies and that they were not obligated to identify anyone.[1]

Dib Sounn identified appellant as the person driving the Dodge on the night of the robbery. None of the witnesses identified appellant as one of the robbers who entered the apartment. One witness identified appellant's brother as one of those who entered the apartment.

The District Attorney of San Joaquin County filed a petition with the juvenile court alleging appellant committed a robbery in violation of Penal Code section 211 and in the commission of such robbery he personally used a firearm within the meaning of Penal Code section 12022.5. An interpreter was appointed for appellant.[2]

---

[1] In accordance with *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967].

[2] The People do not dispute that appellant required the assistance of an interpreter.

Appellant's motion to suppress evidence of his lineup identification on the ground it was obtained as the result of an illegal detention was denied.

At the contested jurisdictional hearing, none of the victims identified appellant as one of the active perpetrators of the robbery, or as one of those who used a gun.[3] Dib Sounn testified he saw appellant in the Dodge on the night of the robbery.

Appellant's brother testified he owns a Plymouth and he was driving this car when the police stopped him and his companions two days after the robbery. He testified appellant was sick with a cold the night of the robbery and stayed home the entire night. Appellant's uncle, with whom appellant lived at that time, corroborated this testimony.

Both of these witnesses, as well as one other, required a Vietnamese interpreter. Before they testified, the court observed that another Vietnamese interpreter was needed to translate their testimony. Without consulting her client, appellant's attorney permitted the court to "borrow" appellant's interpreter to translate for the Vietnamese witnesses. Appellant's interpreter also was used briefly when his brother was questioned as a prosecution witness.

The court sustained the allegations of the petition and adjudged appellant a ward of the court pursuant to Welfare and Institutions Code section 602. The court further found the welfare of appellant required he be removed temporarily from the custody of his grandfather and that "it would be detrimental to him if he does not serve a commitment at juvenile hall." He was committed for 160 days with credit for 30 days already served. Restitution to the victims was ordered in an amount to be determined by the probation officer.

DISCUSSION

I

We initially consider the contention that appellant was denied his right to an interpreter throughout the proceedings by reasons of the "borrowing" of his interpreter, without his consent, to translate the testimony of Vietnamese witnesses.

Article I, section 14 of the California Constitution provides "[a] person unable to understand English who is charged with a crime has a right

---

[3]The People concede there is no evidence to support the gun use allegation.

to an interpreter throughout the proceedings." In *People* v. *Aguilar* (1984) 35 Cal.3d 785 [200 Cal.Rptr. 908, 677 P.2d 1198], our Supreme Court held that "borrowing" a defendant's interpreter to translate other witnesses' testimony is a denial of defendant's right to an interpreter "throughout the proceedings," and requires reversal of the judgment absent a knowing and intelligent waiver by the defendant, affirmatively shown on the record. ■ As the court stated, "California's constitution does not provide a half measure of protection. Rather, it requires that when an interpreter is appointed for a criminal defendant, that interpreter must be provided to aid the accused during the whole course of the proceedings." (At p. 790.) "The defendant's right to understand the instructions and rulings of the judge, the questions and objections of defense counsel and the prosecution, as well as the testimony of the witnesses is a continuous one. At moments crucial to the defense . . . the non-English speaking defendant who is denied the assistance of an interpreter, is unable to communicate with the court or with counsel and is unable to understand and participate in the proceedings which hold the key to freedom." (At pp. 790-791.) Thus, " 'nothing short of a sworn interpreter at defendant's elbow,' will satisfy the article I, section 14 guarantee to an interpreter throughout the proceedings." (At p. 792.)

■ An interpreter is required to effectuate basic rights that would be of little value in his or her absence. The very right of a defendant to be present at the proceedings necessitates an interpreter. "[A] defendant's 'presence,' his sensibility and comprehension of the criminal trial process, is impaired . . . by the sole reliance on a witness interpreter. When acting in that capacity, an interpreter does not provide the defendant with translations of the court's ruling or of open-court colloquy between the bench and counsel. These are integral parts of 'the proceedings.' " (*People* v. *Menchaca* (1983) 146 Cal.App.3d 1019, 1025 [194 Cal.Rptr. 691]; cited with approval in *Aguilar, supra,* 35 Cal.3d at p. 792.)

■ An interpreter throughout the proceedings is necessary to provide effective assistance of counsel. " 'An interpreter is needed . . . if a party is unable to understand and speak English sufficiently to comprehend the proceedings and to assist counsel in the conduct of the case.' " (*Aguilar, supra,* 35 Cal.3d at p. 793.) " '[I]t is . . . imperative that every criminal defendant . . . possess "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." ' " (*Ibid.*) " '[I]t is nearly impossible for one interpreter to translate the testimony of a witness while simultaneously translating and listening to the discussions between defendant and counsel. It is in these circumstances that a defense interpreter is most needed to ensure adequate representation by the defendant's counsel.' [Citation.]" (*Ibid.*)

Moreover, when a defendant's interpreter is taken from him and used to translate witness testimony, it cannot be assumed defendant clearly hears and understands the question and answer exchange. (*Id.*, at p. 792; *Menchaca, supra,* 146 Cal.App.3d at p. 1024.) If a defendant does not understand both questions and answers, he is denied the ability to "spontaneously understand" the testimony. " ' ' "A defendant's inability to spontaneously understand testimony being given would undoubtedly limit his attorney's effectiveness, especially on cross-examination. It would be as though a defendant were forced to observe the proceedings from a soundproof booth or seated out of hearing at the rear of the courtroom, being able to observe but not comprehend the criminal processes whereby the state had put his freedom in jeopardy." ' " (*Menchaca, supra,* at p. 1024.)

■ An interpreter is also necessary to the exercise of a defendant's right to confront and cross-examine witnesses. It is " ' 'necessary . . . that he be provided with a simultaneous translation of what was being said for the purpose of communicating with his attorney to enable the latter to effectively cross-examine those English-speaking witnesses to test their credibility, their memory and their accuracy of observation . . . .' " (*Aguilar, supra,* 35 Cal.3d at p. 793.)

■ "Requiring two interpreters . . . has additional benefits to the criminal justice system because 'it is difficult for an interpreter who has worked closely with the defendant and his counsel in the preparation of the defense from the pretrial stage to translate the court proceedings impartially. Finally, a separate defense interpreter would serve to ensure the accuracy of the proceedings and witness interpreters.' " (*Ibid.*; fn. omitted.)[4]

■ A juvenile accused of a crime in a section 602 proceeding is no less in need of an interpreter throughout the proceedings to ensure a fair hearing. Minors are "persons" under our constitution possessed of a variety of due process rights afforded to defendants in criminal proceedings. (*In re Scott K.* (1979) 24 Cal.3d 395, 401, and fn. 4 [155 Cal.Rptr. 671, 595 P.2d 105].) In wardship proceedings, minors have the right to trial; the right to be represented by counsel; the right to confront and cross-examine witnesses; and the right to be present at the hearing. (Welf. & Inst. Code, §§ 679, 702.5; Cal. Rules of Court, rule 1353, 1354(a); *In re Scott K., supra,* 24 Cal.3d at p. 401, fn. 4.) As in adult criminal proceedings, these rights would be of little value without an interpreter throughout the proceedings. While "[m]inors' rights are often legitimately curtailed when the restriction

---

[4]The need for an interpreter at appellant's side to ensure the accuracy of testimony is particularly compelling in this case, where much of the testimony against appellant had to be translated twice: from Cambodian to English and from English to Vietnamese.

serves a state's interest in promoting the health and growth of children" and "rights may not be asserted if they might disrupt unique features of the proceedings," the right to an interpreter, like search and seizure laws, "hardly seem[s] disruptive or otherwise inconsistent with the state's interest in child welfare." (*In re Scott K., supra,* at pp. 401-402.) "[M]inors have a liberty interest that entitles them to due process whenever a state initiates action to deprive them of liberty." (At p. 402.)

■ Appellant was entitled to an interpreter at his side throughout the proceedings. "[T]he 'borrowing' of the interpreter, the accused's only means of communicating with defense counsel and understanding the proceedings, was a denial of a constitutional right." (*Aguilar, supra,* 35 Cal.3d at p. 791; fn. omitted.) The judgment must be reversed unless the record shows he made a knowing and intelligent waiver of this right. (At p. 794.)[5]

■ A waiver of the right to an interpreter must be personal and must be affirmatively shown on the record. The mere acquiescence by defense counsel is not a sufficient waiver. (35 Cal.3d at p. 794.) ■ The record fails to disclose that appellant made a knowing and intelligent waiver. Defense counsel merely acquiesced in the "borrowing" of appellant's interpreter without consulting him, stating "It's perfectly all right to use one interpreter *as far as I'm concerned.*" (Italics added.) The exchange took place entirely in English between counsel, the court and the interpreter. The appellant was excluded. To argue that such an all-English conversation might be used as a waiver "underscores the importance of guaranteeing a non-English-speaking defendant the assistance of an interpreter during the whole course of the proceedings" and "demonstrates the necessity of requiring personal waiver of the right to an interpreter." (*Aguilar,* 35 Cal.3d at p. 791, fn. 6.) "This conversation, being a 'babble of voices' to the defendant, cannot be held to amount to a waiver by him of his right to an interpreter." (*Id.,* at p. 795.)

---

[5]It is irrelevant that appellant's interpreter was used primarily to translate defense testimony, whereas in *Aguilar* the interpreter was used to translate prosecution testimony. A defendant's need to spontaneously understand questions and answers, court rulings, and the colloquy between counsel and the court, and his need to communicate with his counsel and insure the accuracy of translations, is not diminished during the examination and cross-examination of defense witnesses.

Moreover it is clear from the record in this case that when appellant's interpreter was "borrowed," he effectively lost the benefit of her services. When defense counsel assented to the interpreter's use as a witness interpreter, the interpreter asked, "So I will interpret for the witness only, not for him [appellant]?" The court and defense counsel instructed it was sufficient that she simply speak loudly enough for appellant to hear the questions and answers. In all other respects, however, appellant did not have the services of the interpreter during this time. She was not available at his side to translate the court's rulings and other exchanges or to enable appellant to communicate with his counsel. (See *People* v. *Carreon* (1984) 151 Cal.App.3d 559, 570-571 [198 Cal.Rptr. 843].)

■ The standard of reversibility to be applied when the right to an interpreter has been violated has been the subject of recent appellate decisions. In *People* v. *Gomez* (1984) 158 Cal.App.3d 446 [204 Cal.Rptr. 655], and *People* v. *Carreon* (1984) 151 Cal.App.3d 559 [198 Cal.Rptr. 843], the First District, Division Three, and the Fifth District, respectively, held that the denial of the right to an interpreter is not reversible per se but reversible only when defendant demonstrates he has suffered prejudice. We do not so read *Aguilar.*

In *Aguilar,* the court stated as to the "borrowing" of defendant's interpreter, that "A reversal *is required* unless the defendant waived the constitutional right we have described." (*Aguilar, supra,* 35 Cal.3d at p. 794; italics added.) The court in *Gomez,* supra, refused to read this as setting a reversible per se standard, and concluded the question was never presented or considered. (*Gomez, supra,* 158 Cal.App.3d at p. 453, fn. 3.)

The statement in *Aguilar* that reversal is required absent a proper waiver is completely unqualified; there is no indication the court intended to establish a standard of reversibility based upon prejudice. The facts in *Carreon* were at least as compelling as in *Aguilar* (defendant's interpreter was borrowed to translate for the most crucial witness against defendant), yet, unlike *Carreon* and *Gomez,* the court in *Aguilar* did not consider the issue of any prejudicial effect of the violation of defendant's right to an interpreter. Moreover, the cases upon which the court relied also unqualifiedly reversed the judgments, with no intimation that the standard of reversibility was anything but per se. (See *People* v. *Menchaca* (1983) 146 Cal.App.3d 1019 [194 Cal.Rptr. 691]; *People* v. *Chavez* (1981) 124 Cal.App.3d 215 [177 Cal.Rptr. 306].) The *Chavez* court adopted the *Boykin-Tahl* standard which requires reversal absent an affirmative showing on the record that the defendant intelligently and voluntarily waived the constitutional right in question. (*Chavez, supra,* at p. 227; see *Boykin* v. *Alabama* (1969) 395 U.S. 238, 242-243 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122, 130 [81 Cal.Rptr. 577, 460 P.2d 449].) This standard was expressly adopted in *Aguilar* (35 Cal.3d at p. 794, citing specifically to *Chavez).*[6]

In *Carreon,* the court noted that several of the rights effectuated by an interpreter (consultation with counsel, confrontation of witnesses, and due process fairness) do not alone require per se reversal when violated. (*Car-*

---

[6]We note that in discussing the parameters of the right to an interpreter, the Supreme. Court further relied upon a law review article in which the authors advocated a per se standard of reversibility. (Chang & Araujo, *Interpreters for the Defense: Due Process for the Non-English-Speaking Defendant* (1975) 63 Cal.L.Rev. 801, 819-820; hereinafter cited as Chang & Araujo; see *Aguilar, supra,* 35 Cal.3d at pp. 790, 791, fn. 5, 793.)

*reon, supra,* at p. 574.) The court then concluded the borrowing of a defendant's interpreter in violation of his constitutional right is reversible error only if defendant can show he suffered prejudice. However, the court concluded the prejudice "need not be actual, only an informed speculation that the defendant's right to effective representation was denied need be shown." This is the standard of reversibility for ineffective assistance of counsel in multiple representation cases enunciated by the Supreme Court in *People* v. *Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835].

We cannot agree with the court's analysis in *Carreon.* As *Aguilar* points out, many considerations support the right to an interpreter: defendant's right to be "present" at the proceedings; his need to continuously and spontaneously understand the entire proceedings; the need to ensure the accuracy of the proceedings; and the difficulty of an interpreter who has worked closely with the defendant in translating the proceedings impartially. (35 Cal.3d at p. 793.) These considerations taken together make it virtually impossible to assess the prejudicial effect of borrowing a defendant's interpreter.

The *Carreon* court acknowledged this difficulty and refused to adopt the *Watson* standard of reversibility,[7] noting that "[d]ue to the number and variety of other constitutional rights affected by the services of a defense interpreter," the *Watson* test is "inappropriate, if not unworkable." (151 Cal.App.3d at p. 575.) The standard proposed by the *Carreon* court is not any more workable. As stated by Chang & Araujo, *supra*: "When the error alleged is a specific ommision on the part of counsel the harmless error doctrine may be appropriate since the appellate court can assess the impact of a single error with reasonable ease. In the case of the non-English-speaking defendant, however, the language defect pervades the entire proceedings. Not only is it difficult for the defendant, his attorney, and the appeals court to isolate discrete errors due to miscommunication, but there is a high probability that undetectable errors and misunderstanding will profoundly affect the outcome. Because the potential for harm is great and the identification of specific instances of prejudicial harm may be impossible, courts should use a per se rather than a harmless error standard." (Chang & Araujo, at pp. 819-820.)

Accordingly, we conclude the denial of appellant's right to an interpreter throughout the proceedings is reversible per se.[8]

---

[7] *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].

[8] The "borrowing" of appellant's interpreter was only one of many interpretation problems which infected the proceedings from their inception, making it all the more difficult to assess

## II

 It is not necessary to the disposition of this appeal that we determine whether the lineup identification should be suppressed. However, we consider the issue for the guidance of the trial court in the event of a rehearing. Appellant asserts the lineup identification should have been suppressed as it was the product of an investigatory detention that exceeded the bounds of the Fourth Amendment's proscription against arrests without probable cause. Appellant concedes his initial stop and detention was justified; he contends, however, that it exceeded the permissible bounds of an investigatory stop when he and his companions were transported to the police station without consent for a lineup identification. The People concede there was no probable cause to arrest appellant but contend this is a "rare case" in which the police were justified in transporting appellant and his companions to the police station for investigative purposes.

 We agree the police were justified in stopping appellant and his companions for initial investigation and questioning. "[T]o justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing

---

prejudice in this case. At the lineup, the police used a 13-year-old Cambodian boy who "appeared to be" fluent in English to explain the lineup procedures to the Cambodian victims and witnesses. Yet at the suppression hearing, the boy himself required an interpreter to testify and he stated he is "not very" familiar with English.

At the detention hearing, appellant's interpreter was not able to inform appellant of his right to a trial because the interpreter did not know the meaning of the word "trial." This violates section 18.2 of the Judicial Administration Standards, which states courts should use interpreters "who can (a) understand terms generally used in the proceeding before the court." When the court tried to explain to the interpreter what his role was, the interpreter stated "I think I don't have enough English to help." Appellant received a new interpreter at the jurisdictional hearing.

The Cambodian interpreter's translation was uniformly poor, demonstrating little more than a basic grasp of the English language. For example, to the very important question of whether Dib Sounn (upon whose testimony the case hinged) recognized anyone at the lineup, the interpreter answered: "Yes, he saw. He know one guy when he sit on car, he didn't saw anything on the night, but he saw the guy on the police station, he saw the guy." One can only speculate what this answer means. It is not clear whether Dib Sounn actually recognized anyone on the night of the robbery. Earlier testimony indicated he knew the owner of the Dodge, but he did not actually see anyone he recognized that night. This answer is difficult enough to comprehend in English. It would have taken an excellent interpreter indeed to translate a comprehensible answer from English to Vietnamese. Moreover, throughout most of the hearing, the Cambodian interpreter gave answers in the third person, in violation of section 18.1, subdivision (a)(9), of the Judicial Administration Standards.

when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) ■■■ Appellant was a passenger in a car that fit the description of one of the cars used in the robbery and he and his companions generally fit the description of the robbers as young Vietnamese males. This was sufficient justification to stop the car for investigation.

■■■ We further agree however that there was no probable cause to arrest appellant for the robberies. ■■■ "The foregoing standard for *detention* is of lesser degree than that applicable to an *arrest*. Cause for arrest exists when the facts known to the arresting officer 'would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'" (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632]; original italics.) ■■■ The police had no detailed descriptions of the robbers other than their ages and nationalities. There were eight people occupying the car when it was stopped, but only six people were involved in the robbery. Thus at the time of the stop the police did not have probable cause to believe any one of the occupants of the car, including appellant, was guilty of the robberies.

■■■ The question before us is whether the transport of appellant and his companions to the police station for a lineup identification exceeded the permissible bounds of a limited investigatory stop.

■■■ *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], established the propriety of the limited investigatory stop without probable cause. "*Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest." (*Florida* v. *Royer* (1983) 460 U.S. 491, 499 [75 L.Ed.2d 229, 237, 103 S.Ct. 1319].) The narrow intrusions involved in *Terry* and its progeny were not judged "by the general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause . . . only because these intrusions fell far short of the kind of intrusion associated with an arrest." (*Dunaway* v. *New York* (1979) 442 U.S. 200, 212 [60 L.Ed.2d 824, 835, 99 S.Ct. 2248].)

It is well-established that a detention which rises to the level of an arrest, although ostensibly "investigatory" in nature, is subject to Fourth Amendment constraints. "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to

involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" (*Davis* v. *Mississippi* (1969) 394 U.S. 721, 726-727 [22 L.Ed.2d 676, 680-681, 89 S.Ct. 1394]; fn. omitted; see also *Dunaway* v. *New York, supra,* 442 U.S. at pp. 214-215 [60 L.Ed.2d at p. 837].)

Thus, "[d]etentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not . . . seek to verify their suspicions by means that approach the conditions of arrest." (*Florida* v. *Royer, supra,* 460 U.S. at p. 499 [75 L.Ed.2d at p. 237].)[9]

 In this case, the "detention" was far more than a limited investigatory stop. The police made little or no attempt to communicate with the occupants of the Dodge at the scene of the stop, despite the fact that some of them understood English. Instead, the police simply, in Officer Matthew's words, "loaded up the occupants, put them in police cars, transported them to the police facility and transported the car down." Appellant's "detention" "was in important respects indistinguishable from a traditional arrest." (*Dunaway* v. *New York, supra,* 442 U.S. at p. 212 [60 L.Ed.2d at pp. 835-836].) Appellant "was not questioned briefly where he was found. Instead, he was taken . . . to a police car, [and] transported to a police station, . . . He was never informed that he was 'free to go;' . . . The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law. The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record . . . obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." (*Id.,* at pp. 212-213 [60 L.Ed.2d at p. 836].)

---

[9]Investigative detentions on less than probable cause have been found unconstitutional when police removed a suspect to an airport police interrogation room before obtaining his consent to search his luggage (*Florida* v. *Royer, supra,* 460 U.S. at pp. 501-502 [75 L.Ed.2d at pp. 238-239]); when a suspect was taken to police headquarters for custodial interrogation (*Dunaway* v. *New York, supra,* 442 U.S. 200 [60 L.Ed.2d 824]; *Brown* v. *Illinois* (1975) 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254]); when a suspect was detained for the sole purpose of taking his fingerprints (*Davis* v. *Mississippi, supra,* 394 U.S. 721 [22 L.Ed.2d 676]); when a suspect was transported without consent to the scene of the crime for identification by the victims (*People* v. *Harris, supra,* 15 Cal.3d 384); and when a suspect was taken to police headquarters for the sole purpose of photographing him (*People* v. *Farley* (1979) 90 Cal.App.3d 851 [153 Cal.Rptr. 695, 12 A.L.R. 4th 301]).

 "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. [Citations.] It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." (*Florida* v. *Royer, supra,* 460 U.S. at p. 500 [75 L.Ed.2d at p. 238].) Our Supreme Court recognizes that under limited circumstances an officer without probable cause to arrest may transport a suspect to another location for further interrogation or possible identification (*People* v. *Harris, supra,* 15 Cal.3d at p. 390), but " 'it is only in a rare case where, absent probable cause for arrest, the removal of a suspect to a police station for further investigation is constitutionally permissible.' " (*People* v. *Farley, supra,* 90 Cal.App.3d at pp. 861-862.) In keeping within constitutional limits, "transportation of suspects for interrogation or possible identification after an initial detention in the absence of probable cause to arrest must be justified by a showing that it is the least intrusive means of accomplishing the proposed objective." (*Ortega* v. *Superior Court* (1982) 135 Cal.App.3d 244, 255 [185 Cal.Rptr. 297].)

*Harris* identifies several less intrusive and more reasonable alternatives to prearrest transportation: "The officers may call or escort the witness to the detention scene for an immediate viewing of the suspect, or if they are able to procure satisfactory identification from the suspect, arrangements may be made for a subsequent confrontation with the witness. In addition, the consent of the suspect may be sought." (15 Cal.3d at p. 391.)

 The record is barren of any attempts by the police to employ methods of investigative detention less intrusive than immediately transporting appellant and his companions to the police station for a lineup identification. In fact, Officer Matthews had standing orders to bring the car and its occupants to the police station as soon as it was occupied. The car was under surveillance for at least a day but no attempt was made to ascertain its owner. No attempt was made to bring witnesses to the detention scene for an immediate viewing of the suspects. Upon discovery of the Dodge the previous evening, the police brought Dib Sounn to the scene to identify the car. No reason appears for not bringing him to the scene the following evening to determine if he could identify any of the occupants of the car. The record discloses no evidence the police attempted to question the suspects, obtain their identifications or obtain their consent to being transported to the police station for a lineup. Only on arrival at the station did the police explain to the suspects what they were doing.

The People assert the language barrier makes this a "rare case" justifying the transport of the suspects to the police station. However, Officer Matthews testified some of the suspects understood English yet he did not communicate with those who did understand English and have them translate for those who did not, and by this means ask questions, obtain their identifications, or procure their consent to be taken to the police station. Language barriers should not prevent effective criminal investigation, but neither should they be used to circumvent constitutional limitations unless clearly necessary under the circumstances, which is not the situation before us.

Nor have the People pointed to any safety or security reasons that would justify transporting the suspects to the police station. (See *Florida* v. *Royer, supra,* 460 U.S. at p. 505 [75 L.Ed.2d at p. 241]; see also *People* v. *Courtney* (1970) 11 Cal.App.3d 1185 [90 Cal.Rptr. 370].)

The record shows "no attempt was made here to employ procedures which might comply with the requirements of the Fourth Amendment: . . ." (*Davis* v. *Mississippi, supra,* 394 U.S. at p. 728 [22 L.Ed.2d at p. 681].) The People have failed "to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." (*Florida* v. *Royer, supra,* 460 U.S. at p. 500 [75 L.Ed.2d at p. 238].) They have not shown appellant's detention was a "rare case" justifying the magnitude of intrusion involved. Thus, appellant's detention violated the Fourth Amendment and, through the due process clause, the Fourteenth Amendment of the United States Constitution.

The People contend that even if appellant's detention was illegal, the taint on the lineup identification was sufficiently attenuated by appellant's consent to the lineup after a knowing and intelligent waiver of his *Miranda* rights.

Assuming appellant did knowingly and intelligently waive his rights and consent to the lineup once he was at the police station, this alone does not attenuate the taint of the illegal detention. "The *Miranda* warnings in no way inform a person of his Fourth Amendment rights, including his right to be released from unlawful custody following an arrest made without a warrant or without probable cause." (*Brown* v. *Illinois, supra,* 422 U.S. at p. 601, fn. 6 [45 L.Ed.2d at p. 426].) " 'If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or "in-

vestigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.'" (*Dunaway* v. *New York, supra,* 442 U.S. at p. 217 [60 L.Ed.2d at p. 839].)

A recitation of one's *Miranda* rights "is merely a 'threshold requirement' for Fourth Amendment analysis." (*Ibid.*) The Fourth Amendment analysis requires a determination of whether the lineup was " 'obtained by exploitation of the illegality of his arrest' " (*ibid*); i.e., whether it was "a direct and immediate result" of the illegal detention. (*People* v. *Teresinski* (1982) 30 Cal.3d 822, 832 [189 Cal.Rptr. 617, 640 P.2d 753].) Factors to consider include the temporal proximity between the arrest and the obtaining of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of official conduct. (*Dunaway* v. *New York, supra,* 442 U.S. at p. 218 [60 L.Ed.2d at p. 839].)

In the instant case, the lineup occurred during the illegal detention, immediately after an interpreter was obtained. There were no intervening circumstances which broke the connection between the illegal detention and the lineup. Appellant was transported to the police station without probable cause solely for the purpose of placing him in a lineup for identification; the police made no attempt to achieve its investigatory purposes by less intrusive means. The lineup clearly was a direct and immediate result of appellant's illegal detention; the identification of appellant at that lineup should have been suppressed.

Finally, the People argue that the admission of the lineup identification, if error, was harmless as Dib Sounn made an in-court identification which was independent of the lineup identification and which would inevitably have been discovered.

This contention would merit consideration if we were determining whether the introduction of the lineup identification was reversible error, or whether the in-court identification should have been suppressed, an issue not tendered by appellant. But we reverse on other grounds and the question we decide here is whether the lineup identification should have been suppressed in the first instance and thus should be suppressed in the event of a rehearing. That the admission of the lineup identification may have been harmless in the first proceeding, or that the in-court identification may have been based on independent recollection (issues we do not here decide), is in no way determinative of whether it was error to admit the lineup identification in the first instance.

Certainly if the in-court identification was independent of the lineup identification, the in-court identification would be admissible, notwithstanding

the fact that the lineup identification was obtained as a result of an illegal detention. (*United States* v. *Crews* (1980) 445 U.S. 463 [63 L.Ed.2d 537, 100 S.Ct. 1244]; *People* v. *Teresinski, supra,* 30 Cal.3d 822.) However, the lineup identification is no less inadmissible because of this. (See *Crews, supra,* 445 U.S. at pp. 472-473 [63 L.Ed.2d at p. 546] [photographic and lineup identifications were properly suppressed as products of illegal arrest, although the independent in-court identification was improperly suppressed]; and *Teresinski, supra,* at pp. 832-839 [to the same effect with regard to photographic identification].)

In the event of a rehearing, all evidence relating to the lineup identification must be suppressed.

In view of our conclusions with regard to the issues we have addressed, we need not address appellant's remaining contentions.

## DISPOSITION

The judgment is reversed. In the event of a rehearing, all evidence of the lineup identification of appellant shall be inadmissible.

Sparks, J., concurred.

**EVANS, Acting P. J.**—I concur in the result under the compulsion of the majority opinion in *People* v. *Aguilar* (1984) 35 Cal.3d 785 [200 Cal.Rptr. 908, 677 P.2d 1198].